EXHIBIT A

## CHECK PRODUCTS
## PURCHASE AGREEMENT

THIS CHECK PRODUCTS PURCHASE AGREEMENT (this "Agreement") is made and entered into this 7th day of October, 2002 by and between John H. Harland Company ("Harland") and Compass Bank ("Buyer").

WHEREAS, the parties desire to have Harland become Buyer's primary supplier of check products and related services.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

TERM

1.1    This Agreement shall be for an initial term (the "Initial Term") of five (5) years beginning July 1, 2002 (the "Effective Date") and shall continue in effect until June 30, 20 07. This Agreement will renew automatically after the Initial Term for additional consecutive one (1) year terms (each a "Renewal Term"), unless either party at least ninety days (90) prior to the expiration of the then-current term provides written notice to the other party that the Agreement shall not renew.

2.    QUANTITY AND PRODUCTS

2.1    Buyer agrees to purchase from Harland all of its requirements of the total volume of check products including one-writes, small packages and computer checks ("Check Products") that are ordered by or through Buyer and all its branches and affiliates, including those branches and affiliates opened or created by Buyer during the existence of this Agreement and, subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement.

3.    PRICES

3.1    Schedule A to Checks Purchase Agreement attached hereto ("Schedule A") sets forth the wholesale prices Harland will charge Buyer during the Initial Term of this Agreement for Check Products. Buyer shall also be charged for postage, handling and delivery, non-standard services requested by Buyer and all applicable taxes, including sales and use taxes.

3.2    Harland will up-charge the Check Products to Buyer's customers according to the Buyer's instructions in the Up-charge Authorization Form until notified to change by Buyer. Buyer shall give sixty (60) days prior notice to Harland before changing the retail pricing.

4.    INVOICING AND TERMS OF PAYMENT

4.1    Harland will provide Buyer with itemized invoices detailing customer's name, account number, check product description, base price, tax, postage, handling, delivery, and up-charge (when applicable). Harland may also provide NACHA formatted data to the Buyer's data processing center or to the ACH for processing and payment.

4.2    Payment will be due within fifteen (15) days of Buyer's receipt of invoice from Harland. Late payments will be subject to an interest charge of one and one-half percent (1 ½ %) per month or the maximum allowable by applicable law.

CONTRACT #2002-6765\211370299        PAGE 1 OF 11





HARLAND SERVICE LEVEL REQUIREMENTS

5.1   All checks will be printed on paper that meets or exceeds all paper specifications in ANSI standard X9.18. All MICR printing will conform to ANSI standard X9.27.

5.2   Harland will provide telephone coverage sufficient to ensure timely response to service calls from Buyer under normal operating conditions.

5.3   All shipping check product packages shall be of sufficient durability to withstand ordinary wear and tear during the shipping process.

5.4   Harland will reprint at its own expense any order containing defective materials (including materials that fail to comply with the standards set forth in this Section 5) or defective workmanship (including printing errors). While due care shall be taken to manufacture, print, bind and ship all Check Products, and Harland inspects all Check Products, the parties acknowledge it is commercially impossible to detect all errors and imperfections.

6.   BUYER PERFORMANCE EXPECTATIONS

6.1   Buyer shall submit orders for Check Products in accordance with Harland's Standard Policies and Procedures for Submitting Orders as amended from time to time.

6.2   If documentation of excessive errors by Buyer is presented, Buyer will take immediate action to correct the situation.

7.   PRODUCT MARKETING AND PRODUCT CHANGES

7.1   Harland will provide standard marketing materials for use in branch locations to promote the sale of Check Products.

7.2   Buyer acknowledges that some of the Check Products utilize licensed artwork and images and that Harland's license to utilize such artwork and images may restrict the marketing and distribution of such Check Products. Buyer agrees to provide Harland advance written notice of any plans to undertake any new or different marketing or distribution of the Check Products and to abide by any restrictions on the marketing or distribution of Check Products as may be required by the licensor of artwork or images.

7.3   Harland may, at its option, modify designs on any check product (including standard checks and deposit tickets). Harland will notify Buyer of significant check product changes affecting Harland's customer base thirty days (30) in advance of such changes.

7.4   Harland may introduce new Check Products periodically and offer these Check Products at recommended prices to Buyer. Harland may, at its option, change check package sizes on all Check Products as long as an appropriate price adjustment affecting Harland's customer base is made.

8.   CUSTOM DESIGN STOCK

8.1   If Buyer requests Harland to supply a custom design stock, Buyer shall guarantee Harland at least seven thousand five-hundred (7,500) orders for each custom stock design during each twelve (12) month period of this Agreement. If during any twelve (12) month period Harland does not receive orders to meet the minimum guarantee for each custom stock design, then Buyer shall pay Harland an under-utilization charge calculated by multiplying three dollars ($3.00) by the number of orders by which Buyer fell short of its minimum guarantee for each custom design stock.

8.2   Harland reserves the right to discontinue, with ninety (90) days notice, any custom design stock if the guarantee is not met or if during any three (3) month period the annualized purchase volume is less than seventy-five percent (75%) of the guarantee.

CONTRACT #2002-6765\211370299        PAGE 2 OF 11



8.3   Buyer agrees to purchase unused inventories on hand (but not to exceed a ninety (90) day supply) of each custom design item at Harland's cost (i) in the event Buyer changes its specifications by deleting or revising items or (ii) upon cancellation or termination of this Agreement for any reason.

9.   **CONFIDENTIAL AND PROPRIETARY INFORMATION**

9.1   The parties agree that Buyer will disclose to Harland certain non-public personal information about Buyer's customers which fall within the provisions of the Federal legislation entitled "Privacy of Consumer Financial Information" (12 CFR 332). Harland agrees to maintain the confidentiality of all such information to the same extent that Buyer is required to maintain it. Harland further agrees not to disclose or use any such information except to carry out the purposes for which Buyer provided such information to Harland or is otherwise permitted by such Federal regulation or any similar state regulation by which Buyer may be bound. Harland will maintain and monitor its policies and procedures to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information by addressing administrative, technical and physical safeguards designed to (i) ensure the security and confidentiality of nonpublic personal information relating to Buyer's customers; (ii) protect against any anticipated threats or hazards to the security or integrity of such information; and (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to Buyer.

9.2   Each party at all times shall hold in confidence, and shall at no time advise, use or disclose to any person, except those having a specific need to know in performance of obligations under this Agreement, the terms of this Agreement and any proprietary or confidential information (including Buyer's customers' information and Harland's prices) of one party disclosed to the other. Following termination of this Agreement at Buyer's request, Harland shall delete from its systems Buyer's customers' information.

9.3   All proprietary artwork, photographs, designs and negatives furnished by Buyer to Harland (hereinafter "Artwork") shall remain the property of Buyer. Artwork shall, at Buyer's request or upon termination of this Agreement, be returned to Buyer in the same condition as received, ordinary wear and tear excepted. Harland will make no use of the Artwork except to satisfy and complete its obligations under this Agreement or as otherwise approved in writing by Buyer.

10.   **LIMITATION OF LIABILITY**

10.1   Notwithstanding any other provision of this Agreement, neither Harland nor Buyer shall be liable to the other for special, indirect, consequential or punitive damages, even if the parties have knowledge of the possibility of such damages.

10.2   Notwithstanding any other provision of this Agreement, Harland's liability, if any, for items lost, stolen or unlawfully used, whether before or after shipment shall be limited to the replacement of such items. Provided that such limitation shall not apply to liability resulting from gross negligence or willful misconduct of Harland or its employees.

10.3   EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

11.   **INDEMNIFICATION**

11.1   Subject to the terms and conditions of this Agreement, each party shall indemnify and hold harmless the other party, its employees, officers and agents, from and against all losses, claims, actions (including but not limited to patent, copyright and trademark infringement), damages, penalties, costs and expenses including reasonable attorneys' fees caused by the action or inaction of the indemnifying party, its employees or authorized representatives, in the performance of its obligations under this Agreement.



12. **DEFAULTS AND REMEDIES**

12.1  If Harland or Buyer materially defaults in the performance of any of its material duties or obligations or service level requirements hereunder, and said default is not substantially cured within ninety (90) days after receipt by the defaulting party of written notice specifically identifying the default, or, with respect to those defaults that cannot reasonably be cured within ninety days (90), if the defaulting party fails to provide in writing within ninety days (90) of receipt to the other party a reasonable plan for curing such default and thereafter proceed with all due diligence to substantially cure the same in accordance with such plan, it an at that time the other party may, by giving written notice thereof to the defaulting party, terminate this Agreement by providing ninety (90) days written notice of termination. Notwithstanding the foregoing, this Agreement may be terminated immediately if the defaulting party materially defaults in the performance of its material duties three (3) times in any six (6) month period, whether or not such default is subsequently cured. This Agreement may not be terminated or cancelled for breach or default except pursuant to the provisions of this Section.

12.2  As a material inducement to Harland to offer to Buyer wholesale prices discounted from Harland's list price during the term hereof, Buyer has agreed to use Harland as its primary supplier of check products pursuant to Section 2 of this Agreement. Notwithstanding any other provision hereof, in the event this Agreement is terminated for any reason (other than pursuant to Section 12.1 for a uncured breach by Harland), or if Buyer breaches the provisions of Section 2, Buyer shall repay to Harland the unearned discounts granted to Buyer. The unearned discount for Check Products shall be the aggregate difference between the wholesale prices actually charged to Buyer and Harland's list prices (as adjusted from time to time). Buyer's obligation to repay the unearned discounts shall be in addition to any other remedies available to Harland hereunder.

13. **NOTICES**

13.1  All notices or other communication which shall be or may be given pursuant to this Agreement shall be in writing and shall be delivered by personal service, or by certified mail (return receipt requested), or by a nationally recognized receipted delivery service, or by acknowledged facsimile, addressed to the other party at the address indicated below or as the same may be changed from time to time. Such notice shall be deemed given on the day on which personally served or the day such notice is transmitted or deposited in the U.S. mail.

If to Buyer:  
Compass Bank  
One Compass Place  
New Bedford, MA 02740  
Attention: Carolyn Burnham, EVP  
Facsimile No.: (508) 984 - 6373

If to Harland:  
John H. Harland Company  
2939 Miller Road  
Decatur, GA 30035  
Attention: Contracts Administration  
Facsimile No.: (770) 593-5619

14. **ACQUISITION**

14.1  This Agreement shall be binding upon Harland and Buyer and their respective successors and assigns, and will survive any merger or acquisition by or of either party or its assets.

14.2  This Agreement shall automatically extend to any institution acquired by Buyer if the acquired institution is not otherwise contractually obligated. If the acquired institution is otherwise contractually obligated, then Buyer shall terminate that contract as soon as permissible under that contract, and upon termination, this Agreement shall extend to the acquired institution.

15. **MISCELLANEOUS**

15.1  Wherever this Agreement requires party's approval, consent or satisfaction, such approval, consent or satisfaction may not be unreasonably or arbitrarily withheld or delayed.

15.2  Article headings are included for convenience only and are not to be used to construe or interpret this Agreement.



CONTRACT #2002-6765\211370299    PAGE 4 OF 11

15.3  Neither party's officers or employees, agents or subcontractors will be deemed officers, employees, agents or subcontractors of the other party for any purpose.

15.4  No delay, failure or waiver of either party's exercise or partial exercise of any right or remedy under this Agreement shall operate to limit, impair, preclude, cancel, waive or otherwise affect such right or remedy; provided, however, that this section in no way permits other than actual compliance with the provisions of Section 12.

15.5  The provisions of Sections 9, 10, 11, 12, 13, 14 and 15 and any schedules, attachments and riders shall survive termination of this Agreement.

15.6  If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall in no way be affected or impaired thereby.

15.7  This Agreement may be executed by the parties hereto in one or more counterparts each of which when so executed shall be an original; but all such counterparts shall constitute but one and the same instrument.

15.8  This Agreement shall be governed by the laws of the State of Georgia. The location of Harland's acceptance of this Agreement shall be the State of Georgia.

15.9  The terms and conditions of this Agreement shall apply only to Harland's sale of Check Products to or through Buyer's branches and affiliates located in the United States and/or Puerto Rico.

15.10  Strikes, fires, accidents, power outages, acts of war or terrorism, or other causes beyond the control of Harland which shall affect Harland's ability to perform hereunder shall constitute valid ground for suspension of Harland's performance standards until such time as the event causing the delay has ceased to affect Harland's ability to perform.

15.11  This Agreement, together with all schedules, attachments and riders attached hereto, constitutes the entire agreement between Harland and Buyer and supersedes all other proposals, offers, understandings or agreements, oral or written, between the parties on this subject. This Agreement may be modified only in writing and with the mutual consent of the parties hereto.

IN WITNESS WHEREOF, Harland and Buyer have caused their respective authorized representative to execute this Agreement as of the date first above noted.

JOHN H. HARLAND COMPANY ("Harland")    COMPASS BANK ("Buyer")

By: /s/ John Ravote                     By: /s/ Carolyn A. Burnham
Print Name: John Ravote                 Print Name: Carolyn A. Burnham
Title: VICE PRESIDENT                   Title: Executive Vice President
Date: OCT. 7, 2002                      Date: September 27, 2002



CONTRACT #2002-6765\211370299    PAGE 5 OF 11

## SCHEDULE A TO
## CHECK PRODUCTS PURCHASE AGREEMENT
## COMPASS BANK

1. **SUPPLIES**

   Harland shall supply to Buyer the following at no charge. Applicable tax, postage, handling and delivery will be charged on these items.

   1.1 Buyer's employees will be eligible to receive single orders of pocket style checks at no charge to Buyer and/or Buyer's employees. Orders are limited to one account per employee.

   1.2 Buyer will receive Harland's standard starter kits for personal savings, checking and business checking. Notwithstanding any other provision in this Agreement, Harland shall not be obligated to replace starter kits because of changes to Buyer's name, logo, routing & transit or account number layout.

   1.3 Buyer will receive Harland's standard vinyl covers and registers for pocket checks. Vinyl covers and registers shall be supplied in standard amounts upon receipt of request.

2. **WHOLESALE PRICES**

   2.1 Buyer's initial wholesale prices are indicated in the price table below. Check Products not listed below shall be supplied at Harland List Price. Applicable tax, postage, handling and delivery will be charged in addition to wholesale prices.

   2.2 Harland's wholesale prices and other charges to Buyer are subject to adjustments at the times of Harland's national price increases. Postage, handling and delivery charges and taxes are subject to increase without notice. Harland shall give thirty days' (30) prior notice of adjustments to such base prices and other charges.

   2.3 Pocket check product (Type Usage #0011, #0013, #041, and #081) prices include standard single-part deposit tickets.

| Check Product Category By Type Usage | Pkg Qty | Unit Volume | MPS Code | Wholesale Price to FI | Estimated Annual $ Total |
|---|---|---|---|---|---|
| **CORE CHECK PRODUCTS** | | | | | |
| **Pocket Checks - Type Usage #0011** | | | | | |
| **Wallet Single** | | | | | |
| Medallion | 150 | 990 | 007 | $9.15 | $9,059 |
| MasterPiece | 150 | 909 | 011 | $13.70 | $12,453 |
| A, Regional | 200 | 100 | 013, 020 | $6.70 | $670 |
| B, Alliance Foils | 200 | 477 | 021, 005 | $6.55 | $3,124 |
| C | 200 | 480 | 004 | $6.55 | $3,144 |
| D | 200 | 709 | 002, 006 | $3.75 | $2,659 |
| Alliance Series | 200 | 7,670 | 021 | $3.75 | $28,763 |
| Pocket Pack | 50 | - | 023 | $3.96 | - |
| Custom Design (single scene) | 200 | 14,076 | 003 | $4.20 | $59,119 |

CONTRACT #2002-6765\211370299    PAGE 6 OF 11

Initials: [signature]

Compass Bank
Schedule A Continued

| Check Product Category By Type/Usage | Pkg Qty | Unit Volume | NPC Code | Wholesale Price II | Estimated Annual $ Total |
|---|---|---|---|---|---|
| **CSR CHECK PRODUCTS** | | | | | |
| **Wallet Duplicate** | | | | | |
| Medallion | 150 | 365 | 040 | $11.10 | $4,052 |
| MasterPiece | 150 | 397 | 031 | $15.90 | $6,312 |
| School | 150 | - | 921 | $15.90 | - |
| A, Regional | 150 | 19 | 039, 042 | $7.75 | $147 |
| B | 150 | 168 | 033 | $7.75 | $1,302 |
| Alliance Foil | 175 | | 022 | $9.58 | |
| C | 150 | 248 | 037 | $7.75 | $1,922 |
| D | 150 | 791 | 035 | $4.80 | $3,797 |
| Alliance Series | 175 | 1,019 | 022 | $4.80 | $4,891 |
| Pocket Pack | 50 | | 034 | $5.10 | |
| Super Saver (single order) | 175 | | 043 | $8.32 | |
| Custom Design (single scene) | 175 | | 036 | $9.18 | |
| **Wallet Top Stub** | | | | | |
| Medallion | 150 | 70 | 012 | $11.20 | $784 |
| B | 150 | 108 | 018 | $7.85 | $848 |
| D | 150 | 455 | 015 | $4.93 | $2,243 |
| Custom Design (single scene) | 150 | - | 016 | $9.38 | |
| **Wallet End Stub** | | | | | |
| D | 200 | 193 | 025 | $10.54 | $2,034 |
| **Home Desk Checks - Type Usage #0031** | | | | | |
| B - Style 27 - Single | 300 | 32 | 234 | $30.45 | $974 |
| B - Style 28/29/30 - Single | 300 | 156 | 225 | $21.78 | $3,398 |
| B - Style 28/29/30 - Dup & Freedom (33) | 300 | 6 | 225, 240 | $32.83 | $197 |
| C - Style 27 - Single | 300 | 71 | 232 | $28.28 | $2,008 |
| C - Style 28/29/30 - Single | 300 | 108 | 233 | $20.80 | $2,246 |
| C - Style 28/29/30 - Dup & Freedom (33) | 300 | 32 | 233, 241 | $32.31 | $1,034 |
| D - Style 27 - Single | 300 | 363 | 201 | $26.07 | $9,463 |
| D - Style 28/29/30 - Single | 300 | 670 | 202 | $19.24 | $12,891 |
| D - Style 28/29/30 - Dup & Freedom (33) | 300 | - | 201, 242 | $29.22 | - |
| Odyssey | 300 | 27 | 208 | $27.56 | $744 |
| *Groups include 300 checks, premier cover, 60 deposit tickets, stamp & etc* | | | | | |
| VALUE GROUP: Home Desk Single w/stamp | 300 | | | $36.40 | |
| VALUE GROUP: Home Desk Dup w/stamp | 300 | | | $46.80 | |

CONTRACT #2002-6765\211370299            PAGE 7 OF 11



Compass Bank
Schedule A Continued

| Check Product Category By Type Usage | Pkg Qty | Unit Volume | MPC Code | Wholesale Price to FI | Estimated Annual Total |
|---|---|---|---|---|---|
| **CORE CHECK PRODUCTS** | | | | | |
| **Business Three-to-a-Page Checks - Type Usage #0021** | | | | | |
| Medallion - 300 - Single | 300 | | 121 | $33.53 | |
| Medallion - 300 - Dup | 300 | | 121 | $71.54 | |
| B - 300 - Single | 300 | | 111 | $25.81 | |
| B - 300 - Dup | 300 | | 111 | $51.98 | |
| D - 300 - Single | 300 | - | 101 | $21.95 | |
| D - 300 - Dup | 300 | - | 101 | $46.46 | - |
| D - 300 - Trip | 300 | - | 101 | $65.60 | - |
| Medallion - 600 - Single | 600 | 18 | 121 | $46.30 | $833 |
| Medallion - 600 - Dup | 600 | - | 121 | $105.83 | |
| B - 600 - Single | 600 | 75 | 111 | $37.55 | $2,816 |
| B - 600 - Dup | 600 | - | 111 | $82.80 | |
| D - 600 - Single | 600 | 700 | 101 | $30.00 | $21,000 |
| D - 600 - Dup | 600 | - | 101 | $74.42 | |
| D - 600 - Trip | 600 | | 101 | $113.29 | |
| Custom Design 600 (single scene) - Single | 600 | | 0X0 | $31.42 | |
| Compact 51 - Single | 51 | 8 | 554-000-1 | $10.10 | $81 |
| *Groups include 300 checks, cover, deposit tickets, stamp & cuts* | | | | | |
| VALUE GROUP: Business Single 300 w/stamp | 300 | | | | |
| VALUE GROUP: Business Dup 300 w/stamp | 300 | | | | |
| **Commercial Deposit Tickets - Type Usage #0061** | | | | | |
| Comm DT - Single | 200 | 550 | 311 | $6.79 | $3,735 |
| Comm DT - Dup (bound sep 1-up) | 200 | 830 | 301 | $10.82 | $8,981 |
| Comm DT - Trip | 200 | 155 | 302 | $16.63 | $2,578 |
| Comm DT - Quad | 200 | 41 | 309 | $22.19 | $910 |
| Business DT 3-on Single 300 | 300 | 1,445 | 307 | $10.26 | $14,826 |
| Business DT 3-on Dup 300 | 300 | - | 307 | $21.81 | - |
| **SMALL PACKAGES** | | | | | |
| **Personal Trial Checks - Type Usage #0013** | | | | | |
| Variable Non Refundable Trial | 50 | 34 | 071 | $5.35 | $182 |
| Variable Refundable Trial | 50 | - | 072 | $6.95 | |

CONTRACT #2002-6765\211370299     PAGE 8 OF 11

Compass Bank
Schedule A Continued

| Check Product Category By Type Usage | Pkg Qty | Unit Volume | MPC Code | Wholesale Price to FI | Extended Annual Total |
|---|---|---|---|---|---|
| **POCKET CHECK PRODUCTS** | | | | | |
| **Business Trial Checks - Type Usage #0023** | | | | | |
| Bus Trial 150 - Single | 150 | 6 | 151 | $14.74 | |
| Bus Trial 150 - Dup | 150 | - | 151 | $23.24 | |
| **Personal Deposits - Type Usage #0071** | | | | | |
| Personal Deposit Tickets - Single 100 | 100 | 325 | 325 | $5.32 | $1,729 |
| Personal Deposit Tickets - Dup 100 | 100 | | 325 | $6.56 | |
| Savings (STP / CTP) | 40 | | 351, 353 | $4.68 | |
| **Money Market Packages - Type Usage #0041** | | | | | |
| Money Market (MMA) | (varies) | 660 | 250, 266 | $4.45 | $2,937 |
| Money Market w/ withdrawal tickets | 30/30/16 | - | 250 | $6.27 | |
| **Credit Check Packages - Type Usage #0051** | | | | | |
| Line of Credit (LOC) checks - single | 25 | 560 | 172 | $4.34 | |
| LOC checks - single w/ payment coupons | 25/25 | | 172 | $4.83 | |
| ████████████ | | | | | |
| **Cuts - Type Usage #0051** | | | | | |
| Cuts - Pocket Checks (except School) | 1 | 460 | 400-439 (no: 402,414) | $4.25 | |
| **Accessories - Type Usage #0121** | | | | | |
| Elegant Lettering (Pocket Checks) | 1 | 9,000 | 625 | $4.25 | $38,250 |
| Executive Lettering (Business Checks) | 1 | 32 | 628 | $8.15 | $261 |
| Cover - Premier (Home Desk) | 1 | 252 | 666 | $9.85 | $2,482 |
| Labels By Harland | 150 | 114 | 914 | $6.45 | $735 |
| Standard Opaque Bags, 9x12 (small) | 100 | 55 | 780 | $23.15 | $1,273 |

CONTRACT #2002-6765\211370299        PAGE 9 OF 11

**Compass Bank**
**Schedule A Continued**

| Check Product Category by Type Usage | Pkg Qty | Unit Volume | MPE 6 No. | Wholesale Price in FF | Estimated Annual $ Total |
|---|---|---|---|---|---|
| **CHECK PRODUCTS** | | | | | |

### Specialty Stamps - Type Usage #0141

| | | | | | |
|---|---|---|---|---|---|
| Endorsement Stamp - pre-inked Other | 1 | 335 | 591 | $14.65 | $4,908 |
| Internal Expense Alliance - Sky Blue | 21 | 9,445 | 021 | $2.95 | $27,863 |
| Internal Expense Custom Single | 3 | 19,005 | 003 | $3.50 | $66,518 |
| **TOTALS** | | 74,814 | | | **$387,648** |



CONTRACT #2002-6765\211370299     PAGE 10 OF 11

## RIDER FOR MARKETING ALLOWANCE
## COMPASS BANK

As partial consideration for Buyer's entering into the Check Products Purchase Agreement (the "Agreement") to which this Rider for Marketing Allowance is attached, Harland, on or about the Effective Date, shall provide Buyer a Marketing Allowance (the "Marketing Allowance"), as follows:

1.1   Harland shall pay Marketing Allowances to Buyer calculated at the end of each calendar quarter of the Agreement equal to fifteen percent (15%) of the amount received by Harland, excluding amounts for accessories, handling, delivery, taxes, up-charges and rebates, during such calendar quarter for Check Products sold pursuant to the Agreement.



CONTRACT #2002-6765\211370299           PAGE 11 OF 11