UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOVEREIGN BANCORP, INC., SOVEREIGN BANK, SEACOAST FINACIAL SERVICES CORP.; and COMPASS BANK FOR SAVINGS,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN H. HARLAND COMPANY,<br><br>Defendant. | Civil Action No. 04-11631-EFH |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS DEFENDANT JOHN H. HARLAND'S COUNTERCLAIMS

Pursuant to Rule 12(b)(6), Plaintiffs, Sovereign Bancorp, Inc. ("Sovereign Bancorp"), Sovereign Bank ("Sovereign"), Seacoast Financial Services Corp. ("Seacoast") and Compass Bank for Savings ("Compass") (collectively "Plaintiffs"), hereby submit this memorandum in support of their Motion to Dismiss the Defendant John H. Harland Company's ("Harland's") Counterclaims.

### INTRODUCTION

This case involves a purported requirements contract between Compass and Harland (the "Checks Agreement"). Essentially, Harland would have this court bootstrap a national bank, Sovereign, to a purported requirements contract that Harland had imposed upon a small, local bank, Compass. Plaintiffs have alleged in their complaint that Harland, the supplier, breached

the Checks Agreement when it demanded that Sovereign, as successor to Compass, pay Harland $14,268,298.00 to buy itself out from the Checks Agreement.

Plaintiffs filed suit seeking (i) a declaratory judgment that Sovereign is not bound by the Checks Agreement; (ii) damages for Harland's violation of M.G.L. c. 93A; and (iii) damages for Harland's toritious interference with Plaintiff Sovereign's acquisition of Compass.

Harland responded to Plaintiffs' complaint by asserting a multi-count counterclaim, styled as Harland's "Counterclaims," premised upon the enforceability of the Checks Agreement. Each count of Harland's counterclaims is based upon the alleged validity of the Checks Agreement between itself and Compass.

The Checks Agreement, however, lacks mutuality of obligation, and is, therefore, invalid and unenforceable under applicable law. Each count of Harland's counterclaims should therefore be dismissed. Upon such dismissal, this entire matter will be reduced to Plaintiffs' claims against Harland for tortuous interference and unfair and deceptive trade practices in violation of M.G.L. c. 93A.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  Compass and Harland signed an agreement on or about October 7, 2002, wherein Compass agreed[1] to "purchase from Harland all of its requirements" for certain check products through June 30, 2007 – the "Checks Agreement." (Checks Agreement, attached as **Exhibit A**); (Harland Counterclaims, ¶ 7.)

---

[1] Solely for the purposes of this motion, Plaintiffs ask this court to view all of Harland's factual allegations as true, pursuant to Carroll v. Xerox Corp., 294 F.3d 231, 241 (1 Cir. 2002) (stating that in "reviewing a . . . motion [to dismiss], a court is generally required to (1) treat all of the non-movant's factual allegations as true and (2) draw all reasonable factual inferences that arise from the allegations and are favorable to the non-movant.").

2

2. The Checks Agreement does not, however, provide for the requisite mutual obligation of Harland, i.e., that Harland to agree supply Compass with all of its requirements. **(Exhibit A)**

3. Sovereign and Seacoast entered into an Agreement and Plan of Merger dated as of January 26, 2004, as amended by Amendment to Agreement and Plan of Merger made April 12, 2004 (the "Merger Agreement"). (Plaintiffs' Complaint, ¶ 8.)

4. Pursuant to the Merger Agreement, Seacoast merged with and into Sovereign, and Compass merged with and into Sovereign. After the Merger was complete, Seacoast and Compass had ceased to exist. (Harland Counterclaims, ¶¶ 3-4.)

5. Although it is not a party to the Checks Agreement, Sovereign agreed to discuss the Checks Agreement with Harland in connection with the Merger. For purposes of these discussions, Harland and Sovereign entered into a Confidentiality Agreement dated April 14, 2004 so that Sovereign and Harland could review and discuss the confidential information, if any, contained in the Checks Agreement. (Harland Counterclaims, ¶ 26.)

6. On or about June 9, 2004, Sarah King Bowen, Harland's Vice President and General Counsel, sent Sovereign a letter demanding that Sovereign either (i) purchase all of Sovereign's check product requirements through June 30, 2007 from Harland; or (ii) pay Harland a "Buyout Amount" of $14,268,298.00 in order to secure release from the Checks Agreement. The $14,268,298.00 figure purportedly derives from Sovereign's check product requirements through June 30, 2007. (Harland Counterclaims, ¶ 31.) Further, the letter implies that if Sovereign makes additional bank acquisitions, Sovereign will be compelled to require that the additional banks so acquired thenceforth purchase all of their check products from Harland.

Otherwise, Sovereign will allegedly be required to pay Harland additional, future "Buyout Amounts." (Harland Counterclaims, ¶ 30.)

7. In essence, Harland demanded that the terms of the Checks Agreement not only survive the merger and be binding upon Sovereign, but also that the scope of the Checks Agreement be automatically expanded to include Sovereign's (significantly greater) check product requirements. (Id.)

8. Due to Harland's improper demands, Plaintiffs filed suit on July 1, 2004, seeking damages for Harland's tortious interference with Plaintiffs' advantageous business relations in connection with the Merger, and, pursuant to M.G.L. c. 93A, for Harland's unfair and deceptive trade practices. Plaintiffs also requested relief in the form of a declaratory judgment (i) that Harland's breach of the duty of good faith and fair dealing discharged Compass' alleged obligations under the Checks Agreement; or, (ii) in the alternative, that if the court were to find the Checks Agreement enforceable upon Compass, then any amount owed to Harland would be determined to be the amount of Harland's actual damages, if any, as of the time of the Merger. Such amounts due to Harland, if any, should under no circumstances exceed the unearned discounts Harland actually granted to Compass, minus an offset for any refunds, including any Marketing Allowances, due to Compass and owed by Harland pursuant to the Checks Agreement. (See, e.g., **Exhibit A**, Rider for Marketing Allowance, § 1.1.)

9. On July 29, 2004, Harland filed its counterclaims against Plaintiffs.

10. Count I of Harland's counterclaims seeks a declaratory judgment that Sovereign is obligated to purchase its check product requirements from Harland under the terms of the Checks Agreement. (Harland Counterclaims, ¶ 43.)

11.     Count II of Harland's counterclaims seeks a judgment declaring that Sovereign, as the successor to Compass, is obligated to transfer its current checks requirements business to Harland pursuant to the terms of the Checks Agreement. (Harland Counterclaims, ¶ 47.)

12.     Count III of Harland's counterclaims alleges that Compass "improperly sought to terminate the Checks Agreement" and is, therefore, liable for anticipatory repudiation of the Checks Agreement. (Harland Counterclaims, ¶ 49.)

13.     Count IV of Harland's counterclaims alleges Sovereign Bancorp and Sovereign tortiously interfered with Harland's relationship with Compass when "Sovereign influenced Compass to improperly terminate the Checks Agreement" and directed Compass to conduct business with another check vendor in purported violation of the Checks Agreement. (Harland Counterclaims, ¶¶ 55-57.)

14.     All counts of Harland's counterclaims are premised upon the validity and enforceability of the Checks Agreement.

**ARGUMENT**

**I.     GEORGIA LAW CONTROLS THE INTERPRETATION OF THE CHECKS AGREEMENT.**

It is settled law that, in Massachusetts, "courts routinely enforce choice of law provisions unless the law chosen violates established public policy or bears no reasonable relationship to the contractual transaction between the parties." Lambert v. Kysar, 983 F.2d 1110, 1118 (1st Cir. 1983). If the parties have determined by contract what law governs, "a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement." Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991); see also M.G.L. c. 106, § 1-105(1). Indeed, absent exceptional circumstances or a manifest public policy conflict,

5

Massachusetts courts honor contractual choice-of-law provisions. <u>Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.</u>, 986 F.2d 607, 610 (1st Cir. 1993).

The Checks Agreement states that "[t]his Agreement shall be governed by the laws of the State of Georgia." (**Exhibit A**, § 15.8.) Neither party has asserted that a decision to honor this choice of law provision would violate public policy or the law. (Harland Counterclaims, ¶ 16.) Plaintiffs encourage this court to honor the contractual choice of law provision and apply the law of the State of Georgia to determine the enforceability of the Checks Agreement.

## II.   THE CHECKS AGREEMENT IS UNENFORCEABLE FOR LACK OF MUTUALITY OF OBLIGATION.

The Checks Agreement purportedly obligates Compass, as the buyer, to purchase from Harland "all" of its requirements for checks. Section 2.1 of the Checks Agreement states as follows:

> Section 2.1   Buyer agrees to purchase from Harland all of its requirements of the total volume of check products including one-writes, small packages and computer checks ("Check Products") that are ordered by or through Buyer and all its branches and affiliates, including those branches and affiliates opened or created by Buyer during the existence of this Agreement and, subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement.

(**Exhibit A**, § 2.1.)

It is important to note, however, that the Checks Agreement <u>does not</u> similarly obligate Harland to supply checks to satisfy "all" of Compass' requirements. Rather, the Checks Agreement merely describes, in various places, certain tasks Harland agrees to perform in the event it chooses to supply checks:

> Section 5.1   All checks will be printed on paper that meets or exceeds all paper specifications ....

6

>Section 5.2    Harland will provide telephone coverage sufficient to ensure timely response to service calls from Buyer ....
>
>Section 5.3    All shipping check product packages shall be of sufficient durability ....
>
>Section 5.4    Harland will reprint at its own expense any order containing defective materials ....

(**Exhibit A**, §§ 5.1-5.4.)

In sum, there is <u>no provision</u> in the Checks Agreement that obligates Harland to sell checks to Compass. If Harland were to decline to fill Compass' orders, Compass would be left with no meaningful remedy pursuant to the Checks Agreement.[2] Accordingly, pursuant to the law of the State of Georgia, the Checks Agreement is void for lack of mutuality of consideration. The reasoning applicable to this matter closely parallels that found in <u>Halley v. Harden Oil Company</u>, decided by the Court of Appeals of the State of Georgia. 182 Ga. App. 784 (1987) (attached as **Exhibit B**).

In <u>Halley</u>, the Georgia Court of Appeals considered the enforceability of a purported requirements agreement that allegedly obligated an auto service station owner, Halley, as successor in interest to the prior owner, Edwards, to purchase gasoline exclusively from the Harden Oil Company. 182 Ga. App. at 784-85. The court declared the agreement "unenforceable for lack of mutuality, since there was no obligation whatsoever imposed upon Harden Oil Company to sell gasoline to Edwards (or Halley)." <u>Id.</u> at 785. The reasoning in <u>Halley</u> applies directly to the present matter.

The seller in <u>Halley</u> sought to enforce a purported requirements contract despite the fact that the seller was under no contractual obligation to sell the goods at issue to the buyer. In the

---

[2] Section 12.1 of the Checks Agreement sets forth a procedure in which either party has time to cure any alleged default. Nowhere in the Checks Agreement, however, does Harland promise to be bound to supply Compass with the latter's requirements of checks. <u>See</u> generally **Exhibit A**.

7

present matter, Harland, by its counterclaims, seeks to enforce against Plaintiffs an alleged contract – the Checks Agreement – pursuant to which Harland is under no obligation whatsoever to supply the subject goods to Compass (or Sovereign).

An examination of the Checks Agreement (including its Schedule A) reveals that it does not even qualify as a firm "offer" by Harland. Harland merely agrees "to offer" to Compass, at Harland's discretion, certain goods at certain pricing terms <u>that are, in fact, changeable at will by Harland</u> upon a mere "thirty days' (30)" notice:

> 12.2   As a material inducement to Harland <u>to offer</u> to Buyer wholesale prices discounted from Harland's list price during the term hereof, Buyer has agreed to use Harland as its primary supplier of check products pursuant to Section 2 of this Agreement.
>
> ...
>
> 2.2   Harland's wholesale prices and other charges to Buyer are subject to adjustments at the times of Harland's national price increases. ... Harland shall give thirty days' (30) prior notice of adjustments to such base prices and other charges.

(**Exhibit A**, § 2.2.) (emphasis added); (**Exhibit A**, Schedule A to Checks Agreement, § 2.2.)

Based on the clear language in the Checks Agreement, Harland has, in fact, made no firm offer at all. The purported "offer" is illusory, as it contemplates at-will price increases by Harland. Furthermore, Harland is under no obligation pursuant to the Checks Agreement to honor any particular offer.

In <u>Billings Cottonseed</u>, the Court of Appeals of Georgia again considered the enforceability of a purported requirements contract. 173 Ga. App. 825 (1985) (attached as **Exhibit C**). In <u>Billings Cottonseed</u>, the failure of mutuality of consideration occurred in connection with the buyer's promise. In essence, the alleged agreement at issue did not require

8

the buyer to obtain his goods or services exclusively from the seller.[3] <u>Billings Cottonseed</u>, 173 Ga. App. at 826-27; <u>see</u> <u>also</u> <u>id.</u> at 826 (stating "[i]t is elementary that a requirements contract is one in which the buyer ... promises he will obtain his goods or services from the [seller] exclusively.'") (emphasis in original). Contrary to the matter presently before the court, however, the seller in <u>Billings Cottonseed</u> had agreed to sell to the buyer such quantities as were sufficient to meet all of the buyer's needs:

> Examining the instant agreement under the rule of these authorities, it is clear that while Albany, the seller, is required thereunder to supply "seed sufficient to meet all reasonable requirements of Billings," the buyer, the only promise expressed by Billings [the buyer] in the document was to purchase "seed which, from time to time, it reasonably requires." Thus, while Albany agreed to furnish <u>all</u> of Billings' requirements, there was no promise, express or implied, by Billings to purchase its requirements exclusively from Albany ....

<u>Billings Cottonseed</u>, 173 Ga. App. at 827 (emphasis in original).

Thus, the Georgia Court of Appeals held in <u>Billings Cottonseed</u> that, to be an enforceable requirements contract, the agreement must evidence "clear" agreements from both (i) the buyer, to purchase all of its required goods from the seller; and, (ii) the seller, to supply the buyer with all such goods. <u>See id.</u>

The seller in <u>Billings Cottonseed</u> had made a "clear" promise to sell to the buyer quantities sufficient to meet the buyer's demands. In the present matter, however, the Checks Agreement does not contain any such "clear" promise by Harland to supply goods sufficient to

---

[3] Harland's counterclaims are based upon the premise that the Checks Agreement is an enforceable requirements agreement. For purposes of this motion alone, Plaintiffs concede that the Checks Agreement purports to be a requirements agreement. The language of the Checks Agreement, however, at times refers to Harland as the "primary" supplier. See e.g., **Exhibit A** (the initial "Whereas" clause); **Exhibit A**, § 12.2. The conflicting descriptions of the intended relationships of the parties – "exclusive" versus "primary" – thereby creates a potential issue regarding whether or not the alleged agreement indeed contemplated a true requirements contract. Plaintiffs reserve their right to address this issue at a later date, if necessary, and to dispute whether the Checks Agreement may be considered a requirements agreement in light of the language describing Harland as merely Compass' "primary" supplier. In either event, however, Harland's illusory promise is inadequate consideration to support any such agreement.

9

meet all of Compass' (or any of Compass' successors') requirements. Indeed, the only "promise" Harland makes is to offer its goods at its discretion and at prices which Harland unilaterally retains the power to change. Accordingly, the purported requirements contract fails for lack of mutuality of consideration.

III. **ANY PAROL EVIDENCE WITH RESPECT TO THE CHECKS AGREEMENT, INCLUDING EVIDENCE REGARDING THE PARTIES' ALLEGED INTENTIONS OR COURSE OF CONDUCT, IS INADMISSIBLE FOR PURPOSES OF DETERMINING THE AGREEMENT'S VALIDITY.**

Under the law of the State of Georgia, when the language of a contract is clear and unambiguous, parol evidence is not considered in connection with the determination of the validity of an agreement. See Billings Cottonseed, 173 Ga. App. at 828-29 (disallowing parol evidence and other "extraneous evidence"); Halley, 182 Ga. App. at 785 (disregarding intentions of promisor to be bound to purported requirements agreement); Peach State Meat Co. v. Excel Corporation, 860 F. Supp. 849 (1994) (disregarding "any course of dealing") (attached as **Exhibit D**).

In Billings Cottonseed and Halley, the parties' intentions with respect to a purported requirements agreement were irrelevant to the court's analysis of whether or not the contract, on its face, expressed the requisite mutuality of obligation. Billings Cottonseed, 173 Ga. App. at 828-29; Halley, 182 Ga. App. at 785. After holding that the purported requirements agreement was unenforceable for lack of mutuality, the Halley court stated as follows:

> [E]ven if Halley was aware of the purported [exclusive dealings agreement] prior to his purchase of the property, and even if Halley meant to assume Edwards' position and obligation under that agreement, neither eradicates the determinative fact of the unenforceability of that contract.

Halley, 182 Ga. App. at 785.

The similarity between Halley and the present matter is compelling. In both instances, a seller sought to enforce against the buyer's successor a purported requirements agreement whereby the buyer had pledged to purchase all of its requirements from the seller, but the seller had not in turn promised to meet and/or provide for all of the buyer's needs. The Billings Cottonseed court's approach to the admissibility of "extraneous evidence" provides important guidance regarding the analysis applicable to contract formation issues pursuant to the laws of the State of Georgia:

> Where the language of a contract is plain and unambiguous, however, as we find it to be in the instant case, no construction is required or even permissible. ... "In any event, where the terms of a contract are unambiguous on their face as they were here, parol evidence may not be used to explain their intent and meaning." ...
> It follows that the trail court correctly refused to consider the extraneous evidence advanced by appellant, including testimony as to prior business conduct on non-party entities, and that the grant of summary judgment to appellee on grounds on the unenforceability of the contract was not erroneous for any reason assigned.

Billings Cottonseed, 173 Ga. App. at 828-29 (emphases added).

Pursuant to Billings Cottonseed, alleged statements or conduct, or any other such "extraneous evidence," is not admissible and should not properly be before the court.[4] In sum, under Georgia law, "extraneous evidence" simply is not admissible to determine the intent and meaning of unambiguous contract terms. "As Defendant correctly argues, the want of mutuality cannot be cured by any course of dealing." Peach State, 860 F. Supp. at 852.

---

[4] In Peach State, the U.S. District Court for the Middle District of Georgia held that the subsequent course of conduct of the parties was irrelevant to the court's analysis of whether or not the contract, on its face, expressed the requisite mutuality of obligation. 860 F. Supp. at 852. Peach State examined a purported exclusivity agreement between the plaintiff (a meat packer) and one of his distributors. The meat packer had sued the distributor for breach of contract and fraud. In connection with a counterclaims against the meat packer, the distributor in turn alleged that the parties' course of conduct buttressed an otherwise-deficient written contract and established an exclusive distributorship agreement. Id. at 852-53. The court held that the alleged agreement failed for lack of mutuality of obligation. Id. at 853. The court further stated that, "[a]s Defendant correctly argues, the want of mutuality cannot be cured by any course of dealing." Id. at 852.

In the present matter, an examination of the Checks Agreement reveals that the only "promise" Harland makes is to offer its goods at its discretion and at prices which Harland unilaterally retains the power to change. (**Exhibit A**, § 2.2.); (**Exhibit A**, Schedule A to Checks Agreement, § 2.2.) As was the case in the purported requirements agreement at issue in Halley, there is no provision in the Checks Agreement that requires Harland to perform at all, let alone meet Compass' requirements. (**Exhibit A**) Pursuant to the law of the State of Georgia, the Checks Agreement is void for lack of mutuality of consideration.

## CONCLUSION

For each of the reasons stated above, Harland's counterclaims, and each count therein, should be dismissed as the underlying requirements contract (the Checks Agreement) is unenforceable for lack of mutuality of obligation.

Respectfully submitted,

SOVEREIGN BANCORP, INC.;
SOVEREIGN BANK; SEACOAST
FINANCIAL SERVICES CORP.; and
COMPASS BANK FOR SAVINGS,

By their attorneys,

/s/ John W. Steinmetz
Steven B. Rotman, Esq. (BBO# 558473)
John W. Steinmetz, Esq. (BBO# 568108)
Paula S. Bliss, Esq. (BBO# 652361)
Lee M. Holland, Esq. (BBO# 650617)
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108
(617) 557-5900

Dated: August 18, 2004

## CERTIFICATE OF SERVICE

I, Lee M. Holland, hereby certify that on this 18th day of August 2004 a copy of the foregoing was faxed and mailed, postage prepaid, to:

Bruce E. Falby, Esq.
Steven J. Buttacavoli, Esq.
PIPER RUDNICK LLP
One International Place
21st Floor
Boston, MA 02110

Daniel J. King, Esq.
James N. Gorsline, Esq.
Robert C. Khayat, Jr., Esq.
KING & SPAULDING LLP
191 Peachtree Street
Atlanta, GA 30303

/s/ Lee M. Holland
Lee M. Holland, Esq. (BBO# 650617)