IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SOVEREIGN BANCORP, INC.; SOVEREIGN ) 
BANK; SEACOAST FINANCIAL SERVICES ) 
CORP; and COMPASS BANK FOR SAVINGS, ) 
                               ) 
         Plaintiffs,               ) 
                               ) 
v.                                   ) 
                               ) 
JOHN H. HARLAND COMPANY,       )     CIVIL ACTION NO.: 04-11631-EFH
                               ) 
         Defendant             ) 
                               ) 
                               ) 
                               )

## JOHN H. HARLAND COMPANY'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

Defendant John H. Harland Company ("Harland"), respectfully submits the following response to the motion to dismiss defendant's counterclaims filed by plaintiffs Sovereign Bancorp, Inc. ("Sovereign"), Sovereign Bank, Seacoast Financial Services Corp. ("Seacoast"), and Compass Bank for Savings ("Compass") (collectively "Plaintiffs").

## INTRODUCTION

Plaintiffs' Motion to Dismiss is yet another effort by Plaintiffs to avoid their clear obligations under an agreement to which they no longer want to be bound. Having tried to: (1) seek an undervalued buyout of the agreement they now claim is unenforceable; (2) coerce Harland into foregoing its rights under the agreement by filing an unjustified legal action against it; and (3) unilaterally and impermissibly terminate the agreement, Plaintiffs now undertake a fourth effort to avoid their obligations under the agreement by disavowing a contract that the parties have performed mutually for a year and a half. However, Plaintiffs' arguments on their motion to dismiss do not permit them to escape their clear obligations.

In essence, Plaintiffs contend that the contract at issue in this case is unenforceable for want of mutuality, and that Harland's claims predicated on the contract should be dismissed. Their argument, however, is precluded by Georgia Supreme Court authority, is at odds with the clear intent of the parties as expressed in the relevant agreement, is contrary to the letter and spirit of the U.C.C., and is belied by the relevant course of conduct.[1] The contract is enforceable, and Harland's claims are valid.

## FACTS

The contract at issue in this case is a Checks Products Purchase Agreement (the "Checks Agreement") that was made and entered into on October 7, 2002, by and between Harland and Compass, a bank in Massachusetts. (Counterclaims, ¶ 7).[2] The first recital in the Checks Agreement provides "the parties desire to have Harland become [Compass's] primary supplier of check products and related services." (Checks Agreement, p.1). Under the Checks Agreement, Compass was obligated to purchase from Harland all of its requirements for the total volume of check products ordered by it or any of its affiliates or branches. *Id.* at ¶ 8. The Checks Agreement is for an initial term of five years. *Id.* at ¶ 9. Harland supplied Compass with its requirements under the Checks Agreement for approximately 18 months without objection or complaint from Compass.

In approximately March of 2004, Harland learned that Compass had entered into a definitive plan of merger with Sovereign Bank. *Id.* at ¶ 24. Recognizing that the merger would carry with it clear legal obligations with respect to the Checks Agreement, Harland sought to

---

[1] The Parties' agreement provides that Georgia law applies, and all parties agree that Georgia law applies to this dispute. *See* Plaintiff's Memorandum in Support of Motion to Dismiss, at pp. 5-6.

[2] The Checks Agreement is attached as Exhibit 1 to Harland's Counterclaims.

discuss the Checks Agreement with Sovereign Bank. *Id.* at ¶ 25. Sovereign Bank explained to Harland that it already had an exclusive arrangement for the supply of its check products, and that it did not intend to transfer its business to Harland. *Id.* at ¶¶ 27 - 29. Sovereign Bank then asked Harland to provide it with a proposed amount by which Sovereign Bank could buy out the remainder of the Checks Agreement. *Id.* at ¶ 30. On June 9, 2004, Harland proposed a buyout in the amount of $14,268,298. *Id.* at ¶ 31.

Without any meaningful response to this offer, on July 1, 2004, Plaintiffs filed this lawsuit against Harland in Massachusetts State court seeking (1) declaratory relief; (2) monetary damages based on alleged tortious interference with contract; and (3) monetary damages for alleged violations of the Massachusetts Deceptive Trade Practices Act. *See* Complaint. The gist of Plaintiffs' allegations appears to be that Harland improperly sought to take advantage of the pending merger to obtain a windfall buy-out of its agreement, and that Plaintiffs should be discharged from their contractual obligations.

The merger of Compass and Sovereign Bank was scheduled for July 23, 2004. (Counterclaims, ¶ 36). On July 20, 2004, outside counsel for Plaintiffs, after filing this lawsuit three weeks earlier, sent Harland a letter purporting to terminate the Checks Agreement effective July 22, 2004. *Id.* at ¶ 33. This purported termination letter did not mention any alleged lack of mutuality, nor lodge any complaint as to how Harland had performed its obligations. (*See* Exh. 5 to Harland's Counterclaims). On July 21, 2004, outside counsel for Harland responded to the letter from Plaintiffs' counsel, and explained that the Checks Agreement could not be terminated for convenience, and that Harland stood ready, willing, and able to fulfill in good faith its obligations under the Checks Agreement and expected Compass (and its successors) to do the same. *Id.* at ¶ 34 (*see* Exh. 6 to Harland's Counterclaims). On July 22, 2004, Plaintiffs' outside

counsel responded with a second letter, arguing that the Checks Agreement could be terminated for any reason, and again claiming that the Checks Agreement was terminated effective that day. *Id.* at ¶ 35 (*see* Exh. 7 to Harland's Counterclaims). Harland's counsel responded with a letter again explaining that the Contract did not permit termination for convenience, and that for Sovereign to influence Compass to breach the Checks Agreement prior to the merger date would constitute tortious interference with contract. *Id.* at ¶ 36 (*See* Exh. 8 to Harland's Counterclaims).

On July 22, 2004, Harland removed the case from state to federal court in Massachusetts. On July 29, 2004, Harland filed an answer to Plaintiffs' complaint, along with counterclaims seeking a declaration that the Checks Agreement is binding on Sovereign Bank and its affiliates as the successor to Compass, or alternatively, in the event that the Court determines that the Checks Agreement was effectively terminated by Compass, an award of monetary damages for Compass's anticipatory repudiation of the Checks Agreement and for Sovereign Bank and Sovereign Bancorp's tortious interference with business relationships. *See* Counterclaims.

## ARGUMENT

Plaintiffs argue that Harland's counterclaims should be dismissed because they are predicated upon the existence of a contract which Plaintiffs contend to be unenforceable. Specifically, Plaintiffs claim that the Checks Agreement binds Compass to purchase all of its check products requirements from Harland, but does not include a corresponding obligation for Harland to supply all of Compass's check requirements, and that the Checks Agreement is therefore unenforceable for want of mutuality of obligation.[3]

---

[3] Plaintiffs use the terms "mutuality of obligation" and "mutuality of consideration" interchangeably. As discussed in Section I of this Memorandum, the Restatement Second of Contracts and the Georgia Supreme Court treat the concepts of consideration and mutuality of obligation separately.

This argument is unavailing.  First, because the element of consideration is met, mutuality of obligation is not required and Plaintiffs' claims necessarily fail.  Second, even if mutuality of obligation were a requirement, the Checks Agreement adequately reflects the parties' intent that Compass (now Sovereign Bank) will purchase all of its requirements from Harland, and that Harland will supply such requirements to Compass (now Sovereign Bank).[4] The Checks Agreement therefore does not lack mutuality of obligation.  Third, even if this Court were to find that the Checks Agreement did not reflect on its face Harland's obligations to supply checks, this Court should imply such an obligation to effectuate the intent of the parties.  Fourth, the parties' course of conduct is properly considered by this Court, and reveals that Harland has at all times supplied Compass's check requirements just as the parties intended.  Finally, Plaintiffs' argument raises, at most, an ambiguity in the Checks Agreement that presents a question of fact properly resolved by a trier of fact and not on a motion to dismiss.

## I.    Where The Requirement Of Consideration Is Met, There Is No Additional Requirement Of "Mutuality Of Obligation"

Plaintiffs' argument that the Checks Agreement is unenforceable because it lacks mutuality of obligation is a red herring.  While Harland believes that the Checks Agreement does contain mutuality of obligation (*see* Sections II and III below), Plaintiffs' argument fails as an initial matter because, where the requirement of consideration is met, there is no additional requirement of mutuality of obligation.  According to the Restatement: **"If the requirement of consideration is met, there is no additional requirement of . . . 'mutuality of obligation.'"** Restatement Second of Contracts, § 79 (emphasis added).  What Plaintiffs claim to be missing --

---

[4] Upon the merger of Compass and Sovereign Bank, Compass ceased to exist and Sovereign acceded to all rights and responsibilities of Compass.  For the sake of clarity, Harland refers to the pre-merger contracting party as Compass, even though Compass no longer exists, and Sovereign now stands in the shoes of Compass.

mutuality of obligation -- is not even a requirement where, as here, there is other consideration flowing to the buyer.

Georgia law is in accord with the Restatement. *See Crawford v. Baker,* 207 Ga. 56, 59-60, 60 S.E.2d 146, 149 (1950). In *Crawford,* the plaintiff -- a buyer under a requirements contract -- argued that the agreement was unenforceable for lack of mutuality of obligation because the seller was not required to sell petroleum products to the buyer, although the buyer was obligated to purchase exclusively from the seller. *Id.* This is exactly the allegation made by Plaintiffs here. In *Crawford,* the Georgia Supreme Court rejected buyer's argument, concluding that "[w]hile it is true that the contract in this case imposes upon the plaintiff no obligation to sell petroleum products to the defendant, we cannot agree with the contention of the defendants that this renders the contract so wanting in mutuality as to invalidate it." *Id.* The court reasoned that "the rule that agreements which are optional and not binding on one party are also optional and not binding on the other applies only to agreements which are wholly executory and consist of mutual promises, each the consideration for the other . . . **'[m]utuality of obligation is not required where there is other consideration than a promise.'"** *Id.* (emphasis added.) The court concluded that because the seller provided the buyer with consideration other than a promise to sell the buyer its needs, the contract was enforceable, and that mutuality was not required. *Id.,* 207 Ga. at 61, 60 S.E.2d at 150.

As the Georgia Supreme Court has explained, where there is *no* other consideration for a contract but for the mutual promise of the parties, the mutual promises must be binding on both parties "'for the reason that only a binding promise is sufficient consideration for a promise of the other party.'" *Brack v. Brownlee,* 246 Ga. 818, 818-19, 273 S.E.2d 390, 391 (1980). But **"'where there is any other consideration for a contract so that each promise does not**

6

**depend upon the other for consideration, mutuality of obligation is not essential.'"** *Id.*
(holding that contract was not unenforceable for want of mutuality of obligation and finding
vendor's purported repudiation of contract an anticipatory repudiation) (citations omitted)
(emphasis added). Thus, "[m]utuality is not required where there is consideration other than
mutual promises." *Id. See also W.L. Jorden & Co. v. Blythe Indus., Inc.*, 702 F. Supp. 282, 284
(N.D. Ga. 1988).

Here, it is abundantly clear that Harland supplied consideration. Compass even
acknowledges that it has received such consideration in the Checks Agreement. (Checks
Agreement, p. 1) ("in consideration of the mutual covenants and premises contained herein, and
for other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the parties hereto agree as follows"). Nor is this a case in which the recital does
not reflect the true fact that Compass received consideration. As set forth below, Harland does in
fact undertake to supply Compass with its checks, which is consideration. Harland also pays
Compass a marketing allowance in cash (Checks Agreement, Rider for Marketing Allowance).
Harland also agrees in the Checks Agreement to: (1) charge certain wholesale prices to Compass
(§ 3.1); (2) up-charge check products to Compass's customers in accordance with Compass's
instructions (§ 3.2); (3) provide itemized invoices (§ 4.1); (4) print checks on paper that meets
ANSI standards (§ 5.1); (5) provide telephone coverage sufficient to service calls from Compass;
(6) reprint defective materials; (7) provide marketing materials; and (8) indemnify Compass in
certain circumstances. This is abundant consideration, and mutuality of obligation therefore is
not a requirement.

The authorities relied upon by Plaintiffs do not compel any different conclusion. Indeed,
*Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 173 Ga. App. 825, 328 S.E.2d 426 (1985), one

7

of the primary cases upon which Plaintiffs rely, is wholly in accord with this analysis. In *Billings*, the issue was whether the contract between the buyer and seller was an enforceable requirements contract. *Id.* 173 Ga. App. at 826, 328 S.E. 2d at 429. The court reasoned that "[a] true requirements contract obligates the buyer to purchase exclusively from the seller all the goods needed for a particular use contemplated by the parties: 'In the absence of such a promise, **or some other form of consideration flowing from the buyer to the seller,** the requisite mutuality and consideration for a requirements contract is absent.'" *Id.* (emphasis added). Where -- as here -- there is consideration flowing between the parties, a valid requirements contract is present, and there is no lack of mutuality of obligation.[5]

## II.     The Contract Requires Harland To Supply The Buyer's Requirements

Even if this Court were to conclude that consideration alone is insufficient, and that there is an independent requirement of mutuality of obligation, the Checks Agreement remains enforceable because it does have mutuality of obligation.

### A.     The Parties' Intent That Harland Supply Checks Is Evident In The Checks Agreement

The intent of both parties that Harland supply Compass's requirements is evident on the face of the Checks Agreement. Specifically, the Checks Agreement provides that **"the parties desire to have Harland become Buyer's primary supplier of check products and related services."** (Checks Agreement, p. 1) (emphasis added). This alone reflects Harland's intent to supply Compass's check products, and is a sufficient obligation to form a valid requirements contract. There is, however, more. The Checks Agreement also provides a comprehensive

---

[5] *Halley v. Harden Oil Company*, 182 Ga. App. 784, 357 S.E.2d 138 (1987), the other case on which Plaintiffs primarily rely, simply does not address the issue of whether some form of consideration other than a mutual promise is sufficient consideration, and therefore is not on point. In any event, *Crawford* and *Brack*, as decisions from the Georgia Supreme Court (as opposed to *Halley*, which is from the Georgia Court of Appeals), are controlling authorities.

structure by which Harland is to supply checks to Compass, and how it is to be compensated for doing so. (Checks Agreement § 3). There are specific provisions for invoicing and payment. (Checks Agreement § 4). Harland is required to meet certain "service level requirements," including meeting paper specifications, providing telephone coverage, meeting shipping requirements, and reprinting any order including defective materials. (Checks Agreement § 5). Compass has a specific right to demand cure of any default, and under certain default circumstances, terminate the Checks Agreement. (Checks Agreement § 12). Harland also agreed "as partial consideration for Buyer's entering into the [Checks Agreement]" to provide Compass with a marketing allowance. (Checks Agreement, Rider for Marketing Allowance). Clearly, Harland is obligated to supply Compass with its check products requirements.

When construing the Checks Agreement as a whole, as one must, it is evident that the parties contemplated that Harland would supply all of Compass's check requirements and Plaintiffs' claim that mutuality is lacking must be rejected. *See Mountain Aire Realty, Inc. v. Birdie White Enters., Inc.*, 265 Ga. App. 366, 369, 593 S.E.2d 900, 902-03 (2004) ("'[i]n ascertaining the intent of the parties, the court should ascertain the parties' intent after considering the whole agreement and interpret each of the provisions so as to harmonize with the others'"); *see also Owenby v. Holley*, 256 Ga. App. 13, 16-17, 567 S.E.2d 351, 355 (2002). To conclude as Plaintiffs contend, this Court would have to take an unnecessarily rigid and restrictive reading of the Checks Agreement and ignore the intent of the parties. This is not consistent with the Georgia U.C.C. O.C.G.A. § 11-1-102 ("This title shall be liberally construed and applied to promote its underlying policies and purposes.").

Here, the intent of the parties is clear: Compass agreed to buy its check requirements from Harland, and Harland agreed to supply Compass with its requirements.[6]  Simply because Plaintiffs now want out of the Checks Agreement they cannot go back and change the intent of the parties upon entering the contract, nor can they use a technicality to overcome the parties' intent.

**B.**    **The U.C.C. Does Not Require "Magic Words" To Form A Requirements Contract**

Plaintiffs point to Article 2.1 of the Checks Agreement as proof that Harland has no obligation to supply check products under the Checks Agreement.  That section provides:

> Buyer agrees to purchase from Harland all of its requirements of the total volume of checks products . . that are ordered by or through Buyer and all its branches and affiliates, including those branches and affiliates opened or created by Buyer during the existence of this Agreement, and subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement.

Checks Agreement, Article 2.1. This provision does not expressly state that Harland must supply checks to satisfy "all" of Compass's requirements, and thus does not include the magic words which Plaintiffs apparently claim it must.  However, magic words are not required in order for a contract to be enforceable, and the goal of the court is to look to the parties' intent. *Glazer v. Crescent Wallcoverings, Inc.*, 215 Ga. App. 492, 494, 451 S.E.2d 509, 512 (1994) (in the construction of a contract, "magic words are not required, and the goal of the court is to look for the intent of the parties."); *see also Pepsi-Cola Company v. Steak 'N Shake, Inc.*, 981 F. Supp. 1149, 1158 (S. D. Ind. 1997) ("the U.C.C. does not require certain 'buzz words' to establish a requirements contract").

---

[6] The Georgia U.C.C. is clear that the obligation to supply Compass's requirements is one of the general obligations undertaken by Harland. *See* U.C.C. § 11-2-301 ("The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract.").

If one applies Article 2.1 properly -- seeking to ascertain the parties' intent -- it is clear that this provision does substantively bind Harland to sell the Buyer its check products requirements. By signing an agreement by which the Buyer "agrees to purchase from Harland" all of its check products requirements, Harland was agreeing to supply those requirements, and could not later refuse to sell to the Buyer absent default as specified by the Checks Agreement. As reflected in the recitals to the Checks Agreement, "the parties desire to have Harland become Buyer's primary supplier of check products and related services." If Harland were to refuse to sell to the buyer without justification, it would be wholly contrary to the duty of good faith imposed in all contracts under the Georgia U.C.C. *See* O.C.G.A. § 11-1-203 ("Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.").

### C.    *Halley* and *Billings* Do Not Support A Finding That The Checks Agreement Is Not Enforceable

Plaintiffs rely upon two cases in support of their position that the Checks Agreement is unenforceable, neither of which compels the result Plaintiffs seek here. First, they cite to *Halley v. Harden Oil Company*, 182 Ga. App. 784, 357 S.E.2d 138 (1987). In that case, the Georgia Court of Appeals concluded that a lease agreement which also included an obligation that the lessor purchase gasoline exclusively from the lessee was not in fact a lease, nor a covenant running with the land, and thus was not binding upon the lessor's successor. *Id.* 182 Ga. App. at 785, 357 S.E.2d at 139.[7] The court observed that the lease agreement "more correctly would be classified as an 'exclusive dealings' contract under O.C.G.A. § 11-2-306," and that it was unenforceable by the lessee because there was "no obligation whatsoever" imposed upon the

---

[7] Apparently, the plaintiff in *Halley* was a gasoline company that "leased" property from defendant's predecessor, but permitted defendant's predecessor to operate a gas station situated on the property. In connection with the "lease," the defendants' predecessor agreed to purchase all of his gasoline from the gasoline company.

lessee to sell gasoline to the lessor or its successor. *Id.* Plaintiffs incorrectly claim that this case compels dismissal here.

While the *Halley* court does not recite the relevant contract in its opinion, it is apparent that the contract in *Halley* left a good bit to be desired. The Checks Agreement that Plaintiffs seek to avoid here, however, is a standard and comprehensive contract that adequately governs the relationship of the parties. Further, the court in *Halley* concluded that there was "no obligation whatsoever" for the lessee to sell gasoline to the lessor. *Id.* To the contrary, here the Checks Agreement here does, in fact, impose an obligation on Harland to sell check products to Compass. Whether express (as discussed above) or implied (as discussed in Section III), the Checks Agreement, unlike the agreement at issue in *Halley*, imposes adequate obligations on the parties. In sum, unlike *Halley,* there is mutuality here, and *Halley* opinion does not require a finding that the Checks Agreement is unenforceable.

Plaintiffs also rely heavily upon *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 173 Ga. App. 825, 328 S.E.2d 426 (1985). This case similarly does not compel a finding that the Checks Agreement is unenforceable. In *Billings*, the "dispositive" issue was whether or not a valid requirements contract had been formed. *Id.* 173 Ga. App. at 826, 328 S.E.2d at 429. The court reasoned that "'it is elementary that a requirements contract is one in which the buyer 'expressly or implicitly' promises he will obtain his goods or services from the [seller] *exclusively.*'" *Id.* (emphasis in original) (citation omitted). The court concluded in *Billings* that because the buyer was not required to purchase goods exclusively from the seller, but instead it could purchase the goods from other sources as well and in fact admitted that "purchases had

been made from others," there was no valid requirements contract. *Id.* at 827, 328 S.E.2d at 429.[8]

Here, Harland did in fact agree to supply all of Compass's requirements and Compass agreed to purchase all of its requirements from Harland. These obligations are apparent, or at least implicit, in the Checks Agreement. Such was the parties' course of dealing. This is different than the factual scenario presented in *Billings*. As *Billings* recognizes, however, an implicit promise by a buyer to obtain goods from the seller exclusively is sufficient to establish a valid requirements contract. *Id.* at 826, 328 S.E.2d at 429. Plaintiffs are simply incorrect that Harland is not obligated to provide Compass with its requirements for check products. Thus, mutuality of obligation *and* consideration are present here, and *Halley* and *Billings Cottonseed* do not support dismissal of Harland's counterclaims.

## III.     The Agreement Implicitly Requires Harland To Supply Compass's Requirements

Even if this Court were to find that the Checks Agreement does not explicitly require Harland to supply all of Compass's check requirements, such an obligation is implicit in the Checks Agreement.

### A.     Courts Recognize Implied Obligations In Comparable Circumstances

Courts long have rejected Plaintiffs' arguments that form should trump substance at the cost of the parties' intent. In *Wood v. Lucy, Lady Duff-Gordon*, a case commonly discussed in most law school contracts textbooks, Judge Cardozo held that while a contract did not expressly bind one of the parties, it was not void for want of mutuality because the obligation should be implied. *See* 222 NY 88, 91, 118 N.E.2d 214 (1917). He opined that "[t]he law has outgrown its

---

[8] Notably, that case was decided on a motion for summary judgment, and not on a motion to dismiss. *See id.* at 826, 328 S.E.2d at 428.

primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. A promise may be lacking, and yet the whole writing may be instinct with an obligation imperfectly expressed." *Id.*

While the Checks Agreement might lack the magic words Plaintiffs now contend it must have, the intent of the parties is perfectly clear, and readily should be implied. Similar to *Wood*, "the implication of a promise here finds support in many circumstances." *Id.* For example, in *Wood*, the court found it significant that the defendant agreed to an exclusive agency relationship, and concluded that her very agreement to such a relationship favored a conclusion that the plaintiff agreed to assume certain duties. *Id.* Here, Compass's agreement to purchase checks exclusively from Harland favors the conclusion that the parties intended for Harland to supply Compass's check requirements, and that Harland agreed to do so. As Judge Cardozo observed: "We are not to suppose that one party was to be placed at the mercy of the other." *Id.* Thus, in *Wood*, the court concluded that even though the contract lacked the required language to establish mutuality, such an obligation should be implied. *Id.*

Nor is this authority limited to cases from 1917. As Judge Posner recognized in *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106 (7th Cir. 1999), where a requirements contract does not expressly obligate a seller to supply a buyer with all of its requirements, "such an obligation can be implicit as well as express." *Id.* at 1108 (citations omitted); *see also Berlin & Jones Co. v. Monroe Paper Box Co.*, 137 N.Y.S.2d 155, 156 (1954). Such a conclusion is particularly compelling where the contracts impose exclusivity obligations. *Modern Dairy of Champaign* 171 F.3d 1106 at 1108 ("the inference [of the obligation] would be compelling if the

contracts forbade the [buyer] to turn elsewhere for [the goods]"). As the Seventh Circuit reasoned:[9]

> A buyer would be unlikely to commit to take all his requirements for some good from the seller if the seller had no reciprocal obligation to supply those requirements. That would put the buyer at the seller's mercy. Contract law, in inferring an obligation to sell in these circumstances, would be performing its frequent office of interpolating a contractual term to which the parties would almost certainly have agreed expressly had they thought about the matter . . . .

*Id.*

In *Modern Dairy*, Judge Posner concluded that where the buyers did not obligate themselves to buy their entire requirements from the seller, the seller's reciprocal obligation to supply the buyer's requirements was not triggered. Here, however, the buyer did obligate itself to purchase all of its check requirements from Harland, thus, even if not express, a reciprocal obligation for Harland to supply all of Compass's requirements is implied, and the Checks Agreement does not fail for want of mutuality. *See also Banner Dairies v. Geers*, 292 S.W.2d 169, 171 (Tex. Civ. App. 1956) (holding that "although the contract does not specifically say that the [seller] will sell any amount of ice to [buyer] . . . reading the whole content of said contract . . . it is reasonable to assume that there was an implied agreement on the part of [seller] to sell to appellee . . . .")

## B.  Georgia Courts Routinely Imply Terms Consistent With The Parties' Intent

Georgia law concerning implied contract terms is in accord. The Georgia Court of Appeals has reasoned: "[w]hatever may be fairly implied by the terms of the agreement is in the

---

[9] Because the U.C.C. is a uniform code, and is essentially identical in Georgia, Illinois, Massachusetts, and all other states, precedents from other jurisdictions are persuasive in interpreting the Georgia U.C.C. *See e.g., Paulsen Street Investors v. EBCO Gen. Agencies,* 224 Ga. App. 507, 509, 481 S.E.2d 246, 248-49 (1997) (relying upon law of jurisdictions other than Georgia to interpret the U.C.C.); *see also Unique Designs, Inc. v. Pittard Mach. Co.*, 200 Ga. App. 647, 649, 409 S.E.2d 241, 243 (1991) (same).

eyes of the law embodied in the agreement. One who undertakes to accomplish a certain result agrees by implication to do everything to accomplish the result intended by the parties" *Orkin Exterminating Co. v. Buchanan*, 108 Ga. App. 449, 452, 133 S.E.2d 635 (1963) (holding that "The agreement between the parties, if it did not expressly so provide, fairly implied that the defendant would accomplish the desired results for the plaintiff." 108 Ga. App. at 453-54, 133 S.E.2d at 638); *Herring v. Dunning*, 213 Ga. App. 695, 698, 446 S.E.2d 199, 202 (1994) ("[an implicit contractual provision exists where such provision is necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they apparently deemed it unnecessary to state it"); *Fisher v. Toombs County Nursing Home, Inc.*, 223 Ga. App. 842, 845, 479 S.E.2d 180, 184 (1996) (implying notice requirement into contract).

On the facts of the present dispute, it is clear that the parties undertook a relationship by which Harland was to supply Compass with all of its checks products. Even if such an obligation is not explicit, it certainly should be implied from the terms of the Checks Agreement.

## IV.    The Parties' Course Of Dealing Is Relevant, And Dispositive

Plaintiffs' incorrectly argue at pages 10-12 of their brief that parol evidence "is inadmissible for determining the agreement's validity." Harland does not dispute that where the language of a contract is plain and unambiguous, no construction is required or even permissible, and parol evidence is inadmissible to contradict the terms of the agreement. Harland disagrees, however, with Plaintiffs' position that the parties' course of conduct is never relevant, nor admissible. Certainly, in the event that this Court were to determine that the Checks Agreement includes an ambiguity, extrinsic evidence would be admissible to resolve the ambiguity. *See Owenby v. Holley*, 256 Ga. App. 13, 17, 567 S.E.2d 351, 355 (2002).

Furthermore, under the U.C.C., it is clear that the parties' course of performance is always relevant to determine the meaning of the parties' agreement. O.C.G.A. § 11-2-208 ("where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement"). As noted in the comments to the U.C.C. "[the parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." U.C.C. 11-2-208 Comment 1. Further, "under this section a course of performance is always relevant to determine the meaning of the agreement." *Id.* at Comment 2.[10]

While Plaintiffs try very hard to distance themselves from the prior course of conduct -- because they know it supports Harland's position -- this Court or the trier of fact is entitled to consider the parties' prior course of conduct in the event that it is not persuaded that the Checks Agreement alone is sufficiently clear to resolve this matter. *See Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.* 120 Ga. App. 578, 580, 171 S.E.2d 643, 654 (1969) (holding that evidence of trade usage was admissible in U.C.C. case). Here, Harland has at all times provided all checks ordered by Compass. Clearly, this course of conduct reveals the parties' intent that Harland was to provide all of Compass's check requirements.

---

[10] Under Georgia law, the intentions of the drafters of the Uniform Commercial Code as evidenced in the official comments to the U.C.C. should be given due consideration. *Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.*, 120 Ga. App. 578, 580, 171 S.E.2d 643, 645 (1969) (holding that Comment 2 to U.C.C. Code §2-202 provides that "'[p]aragraph (a) (of the statute) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached").

The cases that Plaintiffs cite for the position that extrinsic evidence cannot be presented are not on point. First, *Billings* merely concluded that where terms of a contract are not ambiguous, parol evidence may not be used to explain their meaning. *Billings*, 173 Ga. App. at 828, 328 S.E.2d at 430 ("where the terms of a contract are unambiguous on their face as they were here, parol evidence may not be used to explain their intent and meaning."). Second, *Peach State Meat Co. v. Excel Corp.*, 860 F. Supp. 849 (M.D.Ga. 1994) concludes only that "the want of mutuality cannot be cured by any course of dealing." *Id.* at 852. Curing a contractual deficiency is different than using course of dealing to inform the interpretation of a contract. Thus, *Peach State* does not compel a finding that course of dealing cannot be considered here.

Harland does not contend that this Court even need to reach issues of course of dealing. If it had do so, however, the course of dealing would show that Harland has at all times honored its obligation to supply Compass with all of its checks requirements. The bottom line is that the Checks Agreement, on its face, is not void for want of mutuality, so this court need not reach course of dealing, and Plaintiffs' motion should be denied.

## V.    Alternatively, At Most, Plaintiffs' Claims Raise A Potential Ambiguity Which Presents A Question Of Fact, Thus Dismissal Is Inappropriate.

While Harland contends that mutuality is not wanting because the allegedly missing obligation is either expressly or at least implicitly evident in the Checks Agreement, Plaintiffs' allegations raise at most a potential ambiguity which must be decided by a trier of fact.

### A.    Any Ambiguity As To Whether A Valid Requirements Contract Was Formed Is A Question Of Fact For A Jury

Plaintiffs' raise, at most, an ambiguity that must be resolved by a jury. In one relevant case from another jurisdiction, Pepsi sued an operator of a restaurant chain for breach of a requirements contract. *Pepsi-Cola Company v. Steak 'N Shake, Inc.*, 981 F. Supp. 1149 (S. D.

Ind. 1997). The operator contended that the contract was not a valid requirements contract, and did not satisfy the statute of frauds because it did not include a quantity provision. *Id.* at 1157-58. Pepsi countered that the contract, taken as a whole, evinced sufficient writing to allow a conclusion that it was a requirements contract which would excuse the absence of a quantity provision. *Id.* at 1158.

In analyzing the contract at issue, the court concluded that the "[c]ontract's language, taken as a whole, sufficiently evinces that a reasonable jury could find the [c]ontract to be a requirements contract." *Id.* [11] The court rejected the defendant's argument urging strict construction of the contract, reasoning that "[e]xcessive rigidity would be unjust and inconsistent with the spirit of the Uniform Commercial Code." *Id.* at 1159. Ultimately, the court concluded that the writings created an ambiguity as to whether a requirements contract had been formed, an issue "which is a question of material fact appropriately left to the trier-of-fact." *Id.*

Here, Plaintiffs' arguments concerning the Checks Agreement raise, at most, an ambiguity as to whether the Checks Agreement is a requirements contract. As set forth above, there are a number of provisions which lead to the conclusion that it is a requirements contract, not the least of which is the obligation that Compass purchase all of its check products from Harland. (*see* Checks Agreement § § 2, 3, 4, 5, and 12). While Harland contends that proper contractual construction compels a finding that the Checks Agreement is a valid and enforceable requirements contract, Plaintiffs complain at most of an ambiguity that should be resolved by a jury, and not on a motion to dismiss.

---

[11] Notably, the court reasoned (as Harland suggests above) that: (1) the U.C.C. does not require certain "buzz words" to establish a requirements contract; (2) the court should not examine each provision in isolation to confirm the existence of a requirements contract; (3) the provisions of the contract must be read as a unified whole; and (4) in certain instances, the promise to buy exclusively from a seller can be implied. *Id.*

**B.    While Construction Of A Contract Is, In The First Instance, A Question Of Law For The Court, An Unresolved Ambiguity Is A Question Of Fact For A Jury**

Georgia law is very clear that the construction of a contract is, in the first instance, a question of law for a court. *Reichman v. Southern Ear, Nose & Throat Surgeons, P.C.*, 266 Ga. App. 696, 699, 598 S.E.2d 12, 15 (2004) (holding that employment agreement provision was ambiguous, could not be resolved by the court, and had to be submitted to a jury). If a court determines that a contract is ambiguous, it must seek to resolve the ambiguity through rules of construction. *Id.* Contract language is ambiguous if it is indistinct, duplicitous, or has an uncertain meaning. *Id.* In the event the court cannot resolve the ambiguity through the rules of construction, resolution of the ambiguity becomes a question of fact for the jury. *Id.; See Owenby*, 256 Ga. App. at 16-17, 567 S.E.2d at 355 ("the inconsistency between the agreement and the remaining instruments creates an ambiguity which can only be resolved by the trier of fact, aided by parol evidence); *Senske v. Harris Trust & Sav. Bank,* 233 Ga. App. 407, 409, 504 S.E.2d 272, 274 (1998) ("[i]f, after application of the rules of construction, there remains an ambiguity, then it becomes the duty of the jury, as finder of fact, to construe the instrument so as to resolve that ambiguity").

Thus, even if this Court concludes that the Checks Agreement is ambiguous, the issue properly should be presented to a jury, and cannot be resolved on a motion to dismiss.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to dismiss Defendant's counterclaims should be denied.

Respectfully submitted this 8th day of September, 2004.

Of Counsel:
KING & SPALDING LLP
Daniel J. King (admitted pro hac vice)
James N. Gorsline (admitted pro hac vice)
Robert C. Khayat, Jr. (admitted pro hac vice)

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5141

/s/Steven J. Buttacavoli
Bruce E. Falby (BBO # 544143)
Steven J. Buttacavoli (BBO # 651440)
PIPER RUDNICK LLP
One International Place
21st Floor
Boston, Massachusetts 02110-2600
(617) 406-6000
(617) 406-6100 (fax)

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that I have on this date served a copy of the foregoing

JOHN H. HARLAND COMPANY'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S

MOTION TO DISMISS COUNTERCLAIMS on counsel of record for all parties by depositing a

copy of same in the U.S. Mail, with adequate postage affixed thereto, addressed as follows:

>Steven B. Rotman
>John W. Steinmetz
>Paula S. Bliss
>ROBINSON & COLE LLP
>One Boston Place
>Boston, Massachusetts 02108

This 8th day of September, 2004.

>/s/Steven J. Buttacavoli
>Steven J. Buttacavoli
>PIPER RUDNICK LLP
>One International Place
>21st Floor
>Boston, Massachusetts
>02110-2600
>(617) 406-6000
>(617) 406-6100 (fax)