UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOVEREIGN BANCORP, INC.; SOVEREIGN BANK; SEACOAST FINANCIAL SERVICES CORP; and COMPASS BANK FOR SAVINGS, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOHN H. HARLAND COMPANY, | ) ) |
| Defendant | ) ) ) ) ) |

CIVIL ACTION NO.: 04-11631-EFH

JOHN H. HARLAND COMPANY'S
ANSWER TO PLAINTIFFS' AMENDED COMPLAINT
AND RESTATEMENT OF ITS VERIFIED COUNTERCLAIMS

Defendant John H. Harland Company ("Harland"), respectfully submits the following Answer and Restatement of its Verified Counterclaims in response to the Amended Complaint filed by plaintiffs Sovereign Bancorp, Inc. ("Sovereign Bancorp"), Sovereign Bank, Seacoast Financial Services Corp ("Seacoast"), and Compass Bank for Savings ("Compass") (collectively "Plaintiffs").

ANSWER

Harland answers Plaintiffs' Amended Complaint as follows:

INTRODUCTION

Harland, upon information and belief, admits the first sentence of the Plaintiffs' Introduction. Harland denies the second sentence of the Introduction. With respect to the third sentence of the Introduction, Harland admits that this sentence describes the claims that Plaintiffs purport to bring, but denies that Plaintiffs are entitled to any of the relief they seek, denies that it

has made any "unfounded" or "bad faith" demands on Plaintiffs, denies that it has interfered with any of Plaintiffs' business relations, and further denies that it is liable for any of the claims described in this sentence. Any remaining allegations in the Introduction are denied. Harland further states that the actual issues and facts concerning this dispute are set forth in its counterclaim.

<u>PARTIES</u>

1.      Upon information and belief, Harland admits the allegations of paragraph 1.

2.      Upon information and belief, Harland admits the allegations of paragraph 2.

3.      Upon information and belief, Harland admits the allegations of paragraph 3.

4.      Upon information and belief, Harland admits the allegations of paragraph 4.

5.      Harland admits the allegations of paragraph 5.

<u>FACTS COMMON TO ALL COUNTS</u>

6.      Harland admits that it entered into the Checks Agreement with Compass on or about October 7, 2002, and that Harland and Compass were the only original signatories to the Checks Agreement. Harland denies the remaining allegations of the first sentence of paragraph 6. Harland lacks information sufficient to form a belief as to the truth of the allegations of the second sentence of paragraph 6, and therefore denies such allegations. Harland denies the remaining allegations of paragraph 6.

7.      Harland admits that Compass in fact agreed to purchase from Harland all of its requirements for check products, but denies that the quoted text is a complete excerpt of § 2.1 of the Checks Agreement which provides in full that "Buyer agrees to purchase from Harland all of its requirements of the total volume of check products including one-writes, small packages and computer checks ("Check Products") that are ordered by or through Buyer and all its branches

and affiliates, including those branches and affiliates opened or created by Buyer during the existence of this Agreement and, subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement." Harland denies any remaining allegations of paragraph 7.

8.    Harland denies the allegations of paragraph 8.

9.    Harland denies the allegations of paragraph 9.

10.    Harland admits that Sovereign was not one of the original signatories to the Checks Agreement. Harland denies the remaining allegations of the first sentence of paragraph 10. Upon information and belief, Harland admits the allegations of the second sentence of paragraph 10.

11.    Upon information and belief, Harland admits the allegations of paragraph 11.

12.    Upon information and belief, Harland admits the allegations of paragraph 12.

13.    Upon information and belief, Harland admits the allegations of paragraph 13.

14.    Harland denies that Sovereign Bank is not a party to the Checks Agreement, and denies that the Checks Agreement is invalid. Harland admits the remaining allegations of paragraph 14.

15.    Harland admits that Sovereign inquired as to whether Harland could supply check products for the former Compass customers through October 15, 2004. Harland is without sufficient information to form a belief as to the truth of the remaining allegations of paragraph 15, and therefore such allegations are denied.

16.    Harland admits that Sovereign Bank asked Harland for a buyout amount. The remaining allegations of paragraph 16 are denied.

17. Harland admits that in response to Sovereign's request that Harland provide Sovereign with a proposed buy out amount, Harland's Sarah King Bowen sent Sovereign the requested proposal by letter on or about June 9, 2004, in which she proposed that Sovereign purchase all of its check product requirements from Harland through June 30, 2007, or alternatively, buy out the remainder of the Checks Agreement for $14,268,298, an amount derived from Sovereign's check product requirements through June 30, 2007. Harland admits that this letter expressed Harland's position that, in the event Sovereign elected to forego a buy out of the remaining term of the Checks Agreement, it would be obligated to purchase all of its check product requirements from Harland, as would any entity acquired by Sovereign. Harland denies that the June 9, 2004 letter "implies" that if Sovereign bought out the remaining term of the Checks Agreement, it would in the future also have to pay Harland "additional, future 'Buyout Amounts'" in the event that it makes additional bank acquisitions. Harland further denies that Sarah King Bowen is Harland's Vice President and General Counsel. For further answer, Harland states that Sarah King Bowen is the Vice President and General Counsel of Harland's Printed Products Division. Any remaining allegations of paragraph 17 are denied.

18. Harland denies the allegations of paragraph 18.

19. Harland denies the allegations of paragraph 19.

<u>COUNT I</u>

20. Harland repeats and realleges each and every response contained in paragraphs 1 through 19 as if fully set forth herein.

21. Harland denies the allegations of paragraph 21.

22. Harland denies the allegations of paragraph 22.

23. Harland denies the allegations of paragraph 23.

4

24.     Harland denies the allegations of paragraph 24.

25.     Harland admits the allegations of the first sentence of paragraph 25.  Harland denies the remaining allegations of paragraph 25.

26.     Harland admits that there is an actual controversy between Plaintiffs and Harland with respect to the Checks Agreement, denies all remaining factual allegations of paragraph 26, and denies that Plaintiffs are entitled to any of the relief requested therein.

<u>COUNT II</u>

27.     Harland repeats and realleges each and every response contained in paragraphs 1 through 26 as if fully set forth herein.

28.     Harland denies the allegations of paragraph 28.

29.     Harland denies the allegations of paragraph 29.

30.     Harland denies the allegations of paragraph 30.

31.     Harland admits that there is an actual controversy between Plaintiffs and Harland with respect to the Checks Agreement, denies all remaining factual allegations of paragraph 31, and denies that Plaintiffs are entitled to any of the relief requested therein.

<u>COUNT III</u>

32.     Harland repeats and realleges each and every response contained in paragraphs 1 through 31 as if fully set forth herein.

33.     Harland denies the allegations of paragraph 33.

34.     Harland denies the allegations of paragraph 34.

35.     Harland admits the allegations of paragraph 35, except Harland denies that the quoted text is a complete excerpt of § 2.1 of the Checks Agreement which provides that "Buyer agrees to purchase from Harland all of its requirements of the total volume of check products

including one-writes, small packages and computer checks ("Check Products") that are ordered by or through Buyer and all its branches and affiliates, including those branches and affiliates opened or created by Buyer during the existence of this Agreement and, subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement."

36.     Harland admits that § 10.1 of the Checks Agreement provides that neither Harland nor Compass shall be liable for "special, indirect, consequential or punitive damages" under the Checks Agreement, but denies all other allegations of paragraph 36.

37.     Harland admits that Sovereign was not an original signatory of the Checks Agreement, but denies all remaining allegations of paragraph 37.

38.     Harland denies the allegations of paragraph 38.

39.     Harland denies the allegations of paragraph 39.

40.     Harland denies the allegations of paragraph 40.

41.     Harland admits that there is an actual controversy between Plaintiffs and Harland with respect to the Checks Agreement.  Harland denies the remaining factual  allegations of paragraph 41, and denies that Plaintiffs are entitled to any of the relief requested therein.

<u>COUNT IV</u>

42.     Harland repeats and realleges each and every response contained in paragraphs 1 through 41 as if fully set forth herein.

43.     Harland denies the allegations of paragraph 43.

44.     Harland lacks information sufficient to form a belief as to the truth of the allegations of paragraph 44, and therefore denies such allegations.

45.    Harland lacks information sufficient to form a belief as to the truth of the allegations of paragraph 45, and therefore denies such allegations.

46.    Harland lacks information sufficient to form a belief as to the truth of the allegations of paragraph 46, and therefore denies such allegations.

47.    Harland denies the allegations of paragraph 47.

48.    Harland denies the allegations of paragraph 48.

COUNT V

49.    Harland repeats and realleges each and every response contained in paragraphs 1 through 48 as if fully set forth herein.

50.    Harland admits the allegations of paragraph 50.

51.    Harland denies the allegations of paragraph 51.

52.    Harland denies the allegations of paragraph 52.

53.    Harland denies the allegations of paragraph 53.

Regarding the unnumbered paragraph beginning "WHEREFORE," Harland denies that Plaintiffs are entitled to any of the relief described in this paragraph, including any of the relief described in subparagraphs a-f.

All allegations in Plaintiffs' Complaint not expressly admitted herein are denied.

DEFENSES

Without assuming any burden where it otherwise lies with Plaintiffs, Harland asserts the following defenses:

FIRST DEFENSE

Plaintiff's Complaint, and each count thereof, fails to state a claim upon which relief can be granted.

7

<u>SECOND DEFENSE</u>

At all times and under all circumstances relevant to Plaintiffs' Complaint, Defendant acted in good faith.

<u>THIRD DEFENSE</u>

Plaintiffs have failed to comply with a condition precedent.

<u>FOURTH DEFENSE</u>

Harland has at all times complied with the terms of the Checks Agreement which is a valid and enforceable agreement.

<u>FIFTH DEFENSE</u>

Plaintiffs' Complaint is barred in whole or in part by the doctrines of laches, waiver, or estoppel.

<u>SIXTH DEFENSE</u>

Plaintiffs failed to mitigate their damages, if any.

<u>RESTATEMENT OF VERIFIED COUNTERCLAIMS</u>

Defendant John H. Harland Company ("Harland") hereby restates and realleges its verified counterclaims as follows:

<u>Parties</u>

1.      Upon information and belief, Plaintiff Sovereign Bancorp, Inc. ("Sovereign Bancorp") is a Pennsylvania corporation headquartered at 2000 Market Street, Philadelphia, Pennsylvania.

2.      Upon information and belief, Plaintiff Sovereign Bank ("Sovereign Bank") is a federally chartered savings bank with its principal place of business at 1130 Berkshire Boulevard, Wyomissing, Pennsylvania.

3.      Upon information and belief, Plaintiff Seacoast Financial Services Corp ("Seacoast") was a Massachusetts corporation with its principal place of business at One Compass Place, New Bedford, Massachusetts.  Upon information and belief, on July 23, 2004 Seacoast merged with and into Sovereign Bancorp, after which Seacoast ceased to exist.

4.      Upon information and belief, Plaintiff Compass Bank for Savings ("Compass") was a bank organized under the laws of the Commonwealth of Massachusetts, with offices located at One Compass Place, New Bedford, Massachusetts.  Upon information and belief, on July 23, 2004 Compass merged with and into Sovereign Bank, after which Compass ceased to exist.

5.      Defendant Harland is a Georgia corporation with a principal place of business at 2939 Miller Road, Decatur, Georgia.

<u>Jurisdiction</u>

6.      Jurisdiction for this action is founded on 28 U.S.C. § 1332, diversity of citizenship.  The parties are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  Venue is appropriate in this Court.

<u>The Checks Agreement</u>

7.      A Checks Products Purchase Agreement ("Checks Agreement") was made and entered into October 7, 2002 by and between Harland and Compass.  As of the effective date, Compass was defined as the "Buyer" under the Checks Agreement.  The Checks Agreement is attached as Exhibit 1 to Plaintiffs' Complaint, and for the convenience of the Court, also is attached as Exhibit 1 to Harland's Answer and Counterclaims, and is attached to this Answer to Plaintiffs' Amended Complaint and Restatement of Its Counterclaims as Exhibit 1.

8.      Pursuant to the Checks Agreement, Compass, the Buyer, agreed to:

> purchase from Harland all of its requirements for the total volume of check products . . . that are ordered by or through Buyer and all its branches and affiliates, including those branches and affiliates opened or created by Buyer during the existence of these agreements and, subject to the provisions of Section 14, those branches and affiliates acquired by Buyer during the existence of this Agreement.

Checks Agreement, § 2.1.

9.      Per its terms, the Checks Agreement is to last for an initial term of five years and is to continue in effect until June 30, 2007.  Checks Agreement § 1.1.

10.     The Checks Agreement provides that it "shall be binding upon Harland and Buyer and their respective successors and assigns, and will survive any merger or acquisition by or of either party or its assets."  Checks Agreement § 14.1.

11.     Therefore, in the event that Compass has successors or assigns in connection with a merger or acquisition, the Checks Agreement specifically extends to the successors or assigns.

12.     The Checks Agreement does not contain any provision permitting termination for convenience.

13.     Indeed, there is only one provision specifying a procedure for termination, which applies only in the event of a material default that is not cured by the defaulting party.  Checks Agreement § 12.1.  This provision provides, in relevant part, that:

> If Harland or Buyer materially defaults in the performance of any of its material duties or obligations or service level requirements hereunder, and said default is not substantially cured within ninety (90) days after receipt by the defaulting party of written notice specifically identifying the default . . . then at that time the other party may, by giving written notice thereof to the defaulting party, terminate this Agreement by providing ninety (90) days written notice of termination.

Checks Agreement § 12.1.

14.     The Checks Agreement also includes an indemnification provision, by which each party agreed to indemnify the other for all losses, damages, costs and expenses including

reasonable attorneys' fees caused by the action or inaction of the indemnifying party in the performance of its obligations under the Checks Agreement.  Checks Agreement § 11.1.

15.     Moreover, in the event of a termination or a breach, "Buyer" is obligated to repay Harland certain unearned discounts based on a formula set forth in the Checks Agreement "in addition to any other remedies available to Harland." Checks Agreement § 12.2. (emphasis added).

16.     The Checks Agreement specifically provides that it is to be governed by the laws of the State of Georgia.  Checks Agreement § 15.8.

17.     While, as described below, Compass is in default of certain obligations under the Checks Agreement, the Checks Agreement has not been terminated under § 12.1 of the Checks Agreement, and it is still in effect and binding on the parties thereto.

### Seacoast, Compass's Parent, Acquires Abington

18.     Upon information and belief, effective April 29, 2004, Abington Bancorp, Inc. ("Abington") merged with and into Coast Merger Sub Corporation, a subsidiary of Seacoast, with Abington as the surviving corporation.  Upon information and belief, the surviving corporation was then merged into Seacoast, with Seacoast as the surviving entity.

19.     Seacoast was Compass's parent, and the successor in interest to Abington.

20.     Pursuant to the Checks Agreement, "Buyer" is required to purchase not only all of its check products requirements from Harland, but also all check products requirements of its "affiliates."  Checks Agreement § 2.1.

21.     Prior to Seacoast's acquisition of Abington, Harland sought to discuss the conversion of the Abington Branches to Harland with representatives of Compass and scheduled a meeting for that purpose.  Compass cancelled the meeting.

22.     On February 23, 2004, Harland's Associate General Counsel wrote to Compass and informed Compass that Harland was aware of Seacoast's acquisition of Abington, that Harland understood that Abington had an agreement with a check vendor other than Harland, and that the agreement between Abington and its check vendor was, by its own terms, to terminate in the near future.  Harland explained to Compass that pursuant to the terms of the Checks Agreement, it was entitled to the checks business from the former Abington branches, and that it would work with Compass to effect a smooth and orderly transition of the Abington branches to the Harland platform.  A complete and correct copy of the February 23, 2004 correspondence is attached as Exhibit 2.

23.     To date, Compass has refused to meaningfully discuss the Abington acquisition with Harland, and Compass has not transferred the Abington checks business to Harland.

<u>Harland Learns Of The Compass/Sovereign Merger</u>

24.     Rather than discussing the Abington merger with Harland, Compass informed Harland by phone that it had signed a definitive merger agreement and plan of merger with Sovereign Bank, that the Abington check business was going directly to Sovereign Bank's check vendor, and that Sovereign was the entity with which Harland should initiate discussions concerning Abington.

25.     As a result of the merger with Compass, Sovereign Bank would become the successor to all of Compass's debts, liabilities, restrictions, disabilities, duties, and obligations, including the Checks Agreement.  Harland agreed to discuss the merger of Sovereign Bank and Compass with a representative of Sovereign Bank.

26.     Because Compass had yet to merge with Sovereign Bank, Harland and Sovereign Bank entered into a confidentiality agreement on April 14, 2004 which permitted Harland to

discuss information concerning its relationship with Compass without violating any confidentiality obligations owed to Compass. A true and correct copy of the confidentiality agreement dated April 14, 2004 is attached as Exhibit 3.

27.    First by phone and later as part of a written buyout offer, Harland explained to Sovereign Bank that it was capable of and willing to provide Sovereign Bank with all of its check requirements. It further explained to Sovereign Bank that both by operation of law and the plain terms of the Checks Agreement, Compass's obligations would extend to Sovereign Bank and its affiliates upon its merger with Compass. Harland then offered to work with Sovereign Bancorp and Sovereign Bank in good faith to achieve a smooth transition of Sovereign Bank from the Deluxe platform to Harland's.

28.    Sovereign Bank explained to Harland that it already had an exclusive contract with Deluxe, a competitor of Harland, and that the Deluxe agreement was soon to expire.

29.    Sovereign Bank claimed that while the agreement with Deluxe was soon to expire, Sovereign Bancorp was considering a merger to take place later in 2004 that would require it to extend its agreement with Deluxe.

30.    Sovereign Bank then asked Harland to provide it with a proposed buyout amount with respect to the remaining term of the Checks Agreement.

31.    Harland complied with Sovereign Bank's request, and provided a proposed buyout amount by letter dated June 9, 2004. In light of the pending merger of Sovereign Bank and Compass Bank, the amount proposed by Harland was based on the projected volume of the contract, through its original term, using Sovereign Bank's estimated check requirements. Specifically, Harland offered to permit Sovereign Bank to buy out the remainder of the Checks

Agreement for $14,268,298.  A true and correct copy of the correspondence by which Harland provided Sovereign Bank with the buyout amount is attached as Exhibit 4.

<u>Sovereign Bank Seeks To Avoid Its Obligations</u>

32.     Shortly thereafter, without any meaningful response to Harland's proposed buyout amount, on approximately July 1, 2004 Plaintiffs commenced this action in Massachusetts state court, asserting claims for declaratory judgment, tortious interference with advantageous relations, and unfair and deceptive trade practices.

33.     On July 20, 2004, only three days before the reported effective date of the merger between Compass and Sovereign Bank, counsel for all of the Plaintiffs sent Harland a letter, purporting to terminate the Checks Agreement effective July 22, 2004 -- with only two days notice, and only one day before the scheduled merger.  A true and correct copy of this letter is attached as Exhibit 5.

34.     On July 21, 2004, Harland responded to the July 20 letter through its counsel. The letter notified Plaintiffs' counsel that because the Checks Agreement could not be terminated for convenience, and because no other condition existed permitting termination of the Checks Agreement, Compass's purported termination notice was improper and unjustified under the Checks Agreement.  A true and correct copy of the July 21 letter is attached as Exhibit 6.

35.     On July 22, 2004, Plaintiffs' counsel sent another letter to Harland, again in support of a purported termination of the Checks Agreement.  A true and correct copy of the July 22 letter is attached as Exhibit 7.

36.     Harland's counsel again responded to Plaintiffs' counsel, again explaining that the Checks Agreement did not permit a termination for convenience, and warning Plaintiffs' counsel that while the Checks Agreement would, upon consummation of the merger, become binding on

Sovereign Bank, any efforts by Sovereign Bank or Sovereign Bancorp to influence Compass to breach the Checks Agreement prior to the merger date would constitute tortious interference with an advantageous contractual relationship. A true and correct copy of this correspondence is attached as Exhibit 8. To date, Plaintiffs' counsel has not withdrawn either of the purported termination letters.

37.    Upon information and belief, Sovereign Bank and Compass, and Sovereign Bancorp and Seacoast, merged on July 23, 2004, and Compass and Seacoast ceased to exist. Sovereign Bancorp and Sovereign Bank acceded to all debts, liabilities, restrictions, disabilities, duties, and obligations of Seacoast and Compass. Upon information and belief, as a result of the merger, Abington, Compass, and Sovereign Bank have become one entity, continuing under the name Sovereign Bank. As of the close of business on July 23, 2004, Sovereign Bank is not fulfilling its obligations as "Buyer" under the Checks Agreement.

38.    By letter dated July 29, 2004, Harland notified Sovereign Bank as successor in interest to Compass that it was in material default under the Checks Agreement by virtue of: (1) its failure to transfer the Sovereign Bank business to Harland; (2) its failure to transfer the Abington business to Harland; and (3) its apparent cessation of orders to Harland. Harland has demanded that Sovereign Bank cure these defaults within the contractually specified notice period. A true and correct copy of the July 29, 2004 correspondence is attached as Exhibit 9.

<u>COUNT I - DECLARATORY JUDGMENT</u>

39.    Harland repeats and realleges each and every allegation contained in Paragraphs 1 through 38 as if fully set forth herein.

40.    The Checks Agreement clearly provides that its exclusive requirements obligations are binding upon all of Compass's successors and affiliates.

41.     As a result of the merger of Compass and Sovereign Bank, Compass's debts, liabilities, restrictions, disabilities, duties, and obligations, including the Checks Agreement extend -- both under the terms of the Checks Agreement and pursuant to applicable corporate law -- to the surviving entity.  Thus, Sovereign Bank, as the surviving entity, is legally and contractually obligated to honor the Checks Agreement and to fulfill <u>all</u> of its check requirements from Harland.

42.     Sovereign Bank now asserts that it, as the surviving entity, is not responsible for complying with the Checks Agreement.  In an apparent effort to escape the legal consequences of the merger, immediately prior to the merger with Sovereign Bank, Compass improperly sought to terminate the Checks Agreement.  Because the only provision in the Checks Agreement that permits termination requires that there be a material default and a 90 day cure period, and because there had been no such default, Compass's purported termination letter was legally ineffective in terminating the Checks Agreement, and it failed to relieve Sovereign Bank of its binding obligations.

43.     There is an actual controversy between Harland and Plaintiffs with respect to whether the Checks Agreement was properly terminated.  Furthermore, there is an actual controversy between Harland and Plaintiffs as to the scope of the Checks Agreement, and whether, by virtue of the merger among Compass and Sovereign Bank (and their parent entities), the combined entity is obligated to purchase all of its check requirements from Harland.  Harland respectfully requests that this Court declare, pursuant to 28 U.S.C. § 2201 that:

a.     Compass legally merged into Sovereign Bank and Compass ceased to exist;

b.     Sovereign Bank is the surviving entity from that merger;

c.      Sovereign Bank as the surviving entity accedes to the debts, liabilities, restrictions, disabilities, duties, and obligations of Compass pursuant to Massachusetts corporate law;

d.       Sovereign Bank is a "successor" to Compass;

e.      the Checks Agreement is binding upon Sovereign Bank;

f.      the Checks Agreement was not properly terminated in accordance with the requirements of the Checks Agreement by Compass's purported notice of termination; and

g.      the Checks Agreement remains in effect and is binding upon Sovereign Bank as the entity surviving the merger of Compass and Sovereign Bank.

<u>COUNT II - DECLARATORY JUDGMENT</u>

44.     Harland repeats and realleges each and every allegation contained in Paragraphs 1 through 43 as if fully set forth herein.

45.     The Checks Agreement clearly provides that its exclusive requirements obligations are binding upon all of Buyer's affiliates and successors, as well as any entities that "Buyer" acquires by virtue of an acquisition.

46.     Seacoast acquired Abington, and as an affiliate of Compass, was obligated to transfer the checks business of Abington to the Harland platform, but never did so.

47.     As there is an actual controversy between Harland and Plaintiffs with respect to the applicability of the Checks Agreement to the Abington business, Harland respectfully requests that this Court declare pursuant to 28 U.S.C. § 2201 that Sovereign Bank, as successor in interest to Compass, is contractually obligated to transfer the Abington business to the Harland platform.

## COUNT III - IN THE ALTERNATIVE, COMPASS IS LIABLE
## FOR ANTICIPATORY REPUDIATION

48.　　Harland repeats and realleges each and every allegation contained in paragraphs 1 through 47 as if fully set forth herein.

49.　　Immediately prior to the merger with Sovereign, Compass improperly sought to terminate the Checks Agreement.  Because the Checks Agreement includes no provision for termination absent a material default, notice, and an opportunity to cure, and because there was not such a default by Harland, the purported termination was improper under the Checks Agreement.

50.　　As set forth in Count I, Harland has requested a declaration that Compass's purported termination was legally ineffective to terminate the Checks Agreement, and that the Checks Agreement is still in force.  In the event that it is determined that the purported termination was effective (which Harland denies), Compass's purported termination constitutes an anticipatory repudiation of its obligations under the Checks Agreement because Compass will have repudiated the Checks Agreement, with respect to performance not yet due, the loss of which will substantially impair the value of the Checks Agreement to Harland.

51.　　Harland therefore pleads, as an alternative to declaratory relief, that Compass is liable for anticipatory repudiation of the Checks Agreement, and is liable for damages, including, but not limited to lost profits that Harland has suffered and will in the future continue to suffer as a consequence of such anticipatory repudiation.

## COUNT IV - TORTIOUS INTERFERENCE WITH
## ADVANTAGEOUS RELATIONS
(Against Sovereign Bancorp and Sovereign Bank)

52.　　Harland repeats and realleges each and every allegation contained in paragraphs 1 through 51 as if fully set forth herein.

53.    Harland and Compass have a business relationship of economic benefit.

54.    Sovereign Bancorp and Sovereign Bank have knowledge of Harland and Compass's business relationship.

55.    Upon information and belief, Sovereign influenced Compass to attempt to improperly terminate the Checks Agreement in order to avoid the clear implications of the Checks Agreement and principles of corporate law.

56.    Upon information and belief, Sovereign improperly dictated that Compass should place the Abington business with a check vendor other than Harland.

57.    Upon information and belief, Sovereign intentionally and improperly, acting without privilege, purposefully and with malice and intent to injure Harland, interfered with Harland's business relationship with Compass through its efforts to: (1) induce encourage or force Compass to, in bad faith, seek to improperly terminate the Checks Agreement and discontinue its relationship with Harland so that the resulting entity could seek to avoid the clear obligations binding upon it; and (2) encourage Compass to violate its contractual obligation to transfer the Abington checks business to the Harland platform.

58.    Sovereign Bancorp and Sovereign Bank's improper conduct has interfered with Harland's business relationship and has caused it to suffer money damages.  As a result of Sovereign Bancorp and Sovereign Bank's willful misconduct, Harland is entitled to its actual damages (in an amount to be proven at trial) and an award of punitive damages.

WHEREFORE, Harland demands judgment:

a.    Adjudging and declaring that:

(1) Compass legally merged into Sovereign Bank and that Compass Bank no longer exists;

(2)    Sovereign Bank is the surviving entity from that merger;

(3)    Sovereign Bank as the surviving entity accedes to the debts, liabilities, restrictions, disabilities, duties, and obligations of Compass pursuant to Massachusetts corporate law;

(4)    Sovereign Bank is a "successor" to Compass;

(5)    the Checks Agreement is binding upon Sovereign Bank and its affiliates;

(6)    the Checks Agreement was not properly terminated by Compass's purported notice of termination;

(7)    the Checks Agreement remains in effect and is binding upon Sovereign Bank as the entity surviving the merger of Compass and Sovereign Bank.

(8)    by virtue of Seacoast's acquisition of Abington, first Seacoast and now the entity resulting from the merger of Seacoast and Sovereign Bancorp are required, by the express terms of the Checks Agreement, to transfer the Abington branches to the Harland platform;

b.    Alternatively, in the event that it is determined that Compass effectively terminated the Checks Agreement prior to its merger with Sovereign Bank, adjudging and awarding Harland its actual and direct damages stemming from Compass's anticipatory repudiation of the Checks Agreement;

c.    Adjudging and declaring that Sovereign Bancorp and Sovereign Bank tortiously interfered with Harland's advantageous relations, and awarding Harland its actual damages;

d.    Assessing punitive damages against Sovereign Bancorp and Sovereign Bank for their willful and intentional interferences with Harland's business relationship;

e.    Awarding Harland all of its attorneys' fees, costs, and expenses incurred in

defending Plaintiffs' claims and bringing this counterclaim;

f.    Awarding Harland such other relief as the Court may deem just and proper.

Respectfully submitted this 5th day of October, 2004.


/s/ Steven J. Buttacavoli
Bruce E. Falby (BBO # 544143)
Steven J. Buttacavoli (BBO # 651440)
PIPER RUDNICK LLP
One International Place
21st Floor
Boston, Massachusetts 02110-2600
(617) 406-6000
(617) 406-6100 (fax)


Of Counsel:
KING & SPALDING LLP
Daniel J. King (admitted pro hac vice)
James N. Gorsline (admitted pro hac vice)
Robert C. Khayat, Jr. (admitted pro hac vice)

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5141

Dated: October 5, 2004

## CERTIFICATE OF SERVICE

I, Steven J. Buttacavoli, hereby certify that on this 5th day of October 2004, a true copy of the above document was served upon the attorney of record for each party by first class mail, postage prepaid.

/s/ Steven J. Buttacavoli